**SOLAREX CORPORATION, Plaintiff,**

v.

**ARCO SOLAR, INC. and Siemens Solar Industries, L.P., Defendants.**

Civ. A. No. 87–237–JJF.

United States District Court,
D. Delaware.

Nov. 6, 1992.

---

Steven J. Balick, Ashby & Geddes, Wilmington, Del., Kenneth E. Payne, Thomas W. Winland, and J. Michael Jakes, Finnegan Henderson Farabow Garrett & Dunner, Washington, D.C., for plaintiff.

Arthur G. Connolly, Jr., Connolly Bove Lodge & Hutz, Wilmington, Del., Harold E. Wurst, Robert A. Green, and Jai ho Rho, Nilsson Robbins Dalgarn Berliner Carson & Wurst, Los Angeles, Cal., for defendants.

## OPINION

FARNAN, District Judge.

This action was filed by Solarex Corporation ("Solarex") in 1987 alleging infringement of Plaintiff's United States Patent Numbers 4,064,521 ("the '521 patent), 4,317,844 ("the '844 patent") and 4,217,148 ("the '148 patent") against ARCO Solar, Inc. ("ARCO"). RCA Corporation ("RCA") who owned the patents in suit and had licensed them to Solarex was joined as a third party defendant. Later, RCA realigned itself as a plaintiff and filed its own complaint in the alternative for infringement. On May 2, 1989, RCA assigned the three patents in suit to Solarex. Solarex's complaint was then amended on January 30, 1990, to reflect that it was the current owner of the patents.

On February 28, 1990, ARCO was merged into a Delaware limited partnership, Siemens Solar Industries ("Siemens"). On August 7, 1990 Siemens was added as a defendant in this action. Defendants deny infringement of the patents in suit and have raised claims for declaratory judgment of noninfringement, invalidity, and unenforceability. Defendants also challenge Solarex's standing to sue for infringement.

All parties agree that this Court has jurisdiction over the parties and the subject matter on RCA's patent infringement claim pursuant to 28 U.S.C. § 1338(a). Venue is proper in this District for this claim pursuant to 28 U.S.C. § 1400(b). The parties are in dispute, however, with respect to jurisdiction and venue regarding Solarex's claims for patent infringement. Solarex alleges that jurisdiction and venue are proper pursuant to 28 U.S.C. §§ 1338(a) and 1400(b), respectively. Defendants challenge the Court's jurisdiction over these claims alleging that Solarex lacks standing to bring this action. The parties agree that if the Court concludes Solarex has standing then jurisdiction and venue are proper pursuant to 28 U.S.C. §§ 1338(a) and 1400(b), respectively.

The Court has jurisdiction over defendants' claims for a declaratory judgment pursuant to 28 U.S.C. §§ 1331 and 1338(a).

Finally, all parties have stipulated that the Court has personal jurisdiction over them.

The Court conducted a bench trial in this action on the issues of infringement, willful infringement, validity, enforceability, and standing. The issue of damages and an issue concerning a license between RCA and Siemens AG from which Siemens Solar claims to benefit, was severed to be tried at a later date.[1] In accordance with Fed. R.Civ.Proc. 52(a), this Opinion shall constitute the Court's Findings of Fact and Conclusions of Law on the issues of standing, infringement, willful infringement, validity, and enforceability.

Because the Defendants challenge the jurisdiction of the Court to hear the claims raised by Solarex, the Court will first address Solarex's standing to bring this action.

## I. STANDING

The United States Constitution limits the jurisdiction of the federal courts to adjudicating "cases or controversies." U.S. Const. Art. III, § 2. A prerequisite under Art. III's case or controversy requirement is that the party seeking to invoke the jurisdiction of a federal court must have standing to do so. A plaintiff must prove three elements to establish standing: (1) personal injury in fact, (2) injury fairly traceable to the alleged unlawful conduct, and (3) the requested relief will redress the injury. *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982).

Although the standing issue in this case grew more complicated and confused as the litigation continued, the basic arguments of the parties remained fairly consistent. ARCO alleges that Solarex does not have standing because as a "mere" non-exclusive licensee, Solarex does not possess a sufficient personal interest in the patents. Solarex, on the other hand, advances three main arguments in support of its standing: (1) the May 2, 1989 assignment from RCA to Solarex of all of RCA's rights in the patents in issue,[2] and the subsequently amended complaint[3] are sufficient to confer standing on Solarex; (2) Solarex was an exclusive licensee at the time it initiated the lawsuit; and (3) the presence of RCA as plaintiff, alleging infringement against ARCO precludes dismissal based on Solarex's alleged lack of standing. The parties have raised numerous factual and legal arguments for and against a finding of standing. The Court has considered all of the arguments raised by both parties, but does not deem it necessary to address each one individually.

The Court concludes that Solarex does have standing to sue ARCO for patent infringement. First, the Court finds that Solarex is an exclusive licensee. An exclusive licensee, as opposed to a non-exclusive licensee, has standing to sue for infringement against those operating within the scope of exclusivity without authority. *Independent Wireless Telegraph Co. v. Radio Corp. of America*, 269 U.S. 459, 468, 46 S.Ct. 166, 169, 70 L.Ed. 357, *reh'g denied*, 270 U.S. 84, 46 S.Ct. 224, 70 L.Ed. 481 (1926). The policy behind granting an exclusive licensee standing to sue is best articulated in *Philadelphia Brief Case Co. v.*

---

**1.** The issue regarding the RCA/Siemens contract was subsequently rendered moot by agreement of the parties to dismiss RCA. (D.I. 245).

**2.** On May 1, 1989 General Electric Company ("GE"), as successor to RCA, and Solarex entered into a supplemental agreement ("Assignment") where RCA assigned all its rights, title and interest in the three patents in suit to Solarex. The assignment stated that it was "the intent of GE and Solarex that these assignments will constitute a basis on which GE will seek to have RCA Corporation dismissed from [this suit]."

An addendum to the Assignment provided that the assignment included "the right to bring suit for infringement of the Subject Patents occurring prior or subsequent to the effective date of the assignment and the right to recover damages arising from infringement of the Subject Patents occurring prior or subsequent to the effective date of the Assignment." (PX–201, Addendum to Supplemental Agreement of May 1, 1989, at ¶ 12).

**3.** (D.I. 62) (Solarex Corporation, and RCA Corporation's Supplemental Complaint, January 30, 1990).

*Specialty Leather Prods. Co.*, 145 F.Supp. 425, 428 (D.N.J.1956), *aff'd*, 242 F.2d 511 (3rd Cir.1957)).

> [S]ince the creation of such rights in the ... exclusive licensee ... prevents the proprietary owner of the patent from creating further rights therein in unknown third parties, this so-called exclusive licensee ... comes so close to having truly proprietary interests in the patent, that courts have held that he is equitably entitled to sue on the patent, provided he joins the true proprietor of the patent in such suit, either as a willing or unwilling plaintiff or defendant....

■ Whether or not a party is an exclusive licensee must be determined according to this policy. Specifically, if the patent owner is precluded from granting further licenses after the date of the license, then the license is exclusive. *See* 6 Donald S. Chisum, Patents § 21.03[2][c] (1992). Thus, the Court's inquiry into whether Solarex has standing as an exclusive licensee must begin with an examination of the RCA–Solarex agreements.

The "Original Agreement" entered into on August 18, 1983 between RCA and Solarex granted Solarex exclusive and non-exclusive license rights under a number of U.S. patents then owned by RCA. (PX–198 and DX–16). The exclusive rights granted were to run until December 31, 1986 and were subject to four pre-existing rights. As such, in the Original Agreement RCA granted Solarex:

> an exclusive license, right and privilege under the Subject Patents to manufacture, use, sell, lease or otherwise dispose of Contract Apparatus.

(DX–16 and PX–198, Article IV, Section 1(a)(i)). The Subject Patents were defined as:

> those United States Patents of RCA listed in Appendix A to this Agreement and, in addition, shall include any United States Patents which issue in favor of RCA based upon any of the patent applications or invention disclosures listed in Appendix A.

(DX–16 and PX–198, Article I, Section 1(e)). Appendix A, which contains a list of all Subject Patents, includes the three patents at issue here. (DX–16 and PX–198, Appendix A). The agreement then defined Contract Apparatus as:

> amorphous silicon solar panels (exclusive of hardware, i.e., frames and junction boxes) comprising one or more solar cells which generate current by the absorption of light by amorphous silicon designed or adapted for the generation of electrical power.

(DX–16 and PX–198, Article I, Section 1(f)).

Further, pursuant to the agreement, Solarex was granted:

> (ii) an exclusive license, right and privilege under the counterparts of the Subject Patents of all countries of the world other than Japan to manufacture Contract Apparatus, and a non-exclusive license, right and privilege under such Patents to use, sell, lease or otherwise dispose of Contract Apparatus; and
>
> (iii) a non-exclusive license under all other Patents of RCA, including RCA's Patents of Japan excluded from the foregoing Section (1)(a)(ii), to manufacture, use, sell, lease and otherwise dispose of Contract Apparatus.

(DX–16 and PX–198, Article IV, Sections 1(a)(ii) and (iii)). RCA's Patents were defined as patents

> owned, controlled and/or obtained by RCA at any time during the term of this Agreement with respect to which and to the extent to which, and subject to the conditions under which, RCA shall have the right to grant licenses or any other rights granted by RCA pursuant to the terms of this Agreement, specifically including pre-existing rights of third parties as set forth in letter to Solarex of even date herewith and attached hereto as Appendix B.

(DX–16 and PX–198, Article I, Section 1(d)). Section 1(g) of Article IV stated that the licenses granted under Section 1, including the exclusive license in Sections (1)(a)(i) and (ii) were subject to certain preexisting rights under prior agreements between RCA and different entities as set out in Appendix B. (DX–16 and PX–198, Article I, Section 1(g)). Appendix B first describes

the pre-existing non-exclusive licenses under RCA's patents. Appendix B goes on to list five contracts between RCA and the federal government under which RCA conducted extensive research. With regard to these government contracts, the letter stated:

Although RCA was successful in obtaining an advance patent waiver in the case of each of [the Government] contracts, the terms and conditions included therein impose ongoing obligations upon RCA which could impact the exclusive rights granted Solarex under the Agreement. Solarex understands and confirms that the rights granted under the Agreement are of necessity, subject to the foregoing licenses and rights.

(DX–17 and PX–198, Appendix B).

Among Solarex's rights under the agreement was the right to sublicense its exclusive rights and to bring or defend lawsuits for infringement of the licensed patents. (DX–16 and P–198, Article IV, Section 1(d) and Article VII, Section 6(e)). In granting the right to bring suit the agreement stated that:

Nothing contained in this agreement shall be construed as:

(e) conferring on Solarex any right or obligation to prosecute or defend any action pertaining to RCA's Patents, except that so long as Solarex's exclusive license is in force with respect to the Subject Patents, Solarex may prosecute or defend any action with respect to the Subject Patents for its own benefit and at its own expense; it being understood that nothing herein set forth shall require RCA, or limit RCA's right, to prosecute or defend actions pertaining to its Patents.

(DX–16 and PX–198, Article VII, Section 6(e)).

On June 1, 1985 RCA and Solarex entered into a supplemental agreement ("the Supplemental Agreement") which amended the 1983 Original Agreement. (DX–18 and PX–199, Supplemental Agreement). In the Supplemental Agreement, Solarex agreed not to assert any Patents controlled by it against a pre-existing licensee of RCA li-

censed to manufacture in Japan, and to use, sell, lease, or otherwise dispose of Contract Apparatus ("Japan licensee"), as long as the Japan licensee mutually agreed not to assert its patent rights against Contract Apparatus manufactured in the United States by Solarex. (DX–18 and PX–199, Supplemental Agreement, ¶ 4, Appendix A).

In exchange for Solarex's covenant RCA terminated the compensation provisions contained in the Original Agreement, and agreed that the compensation for the licenses granted under the Original Agreement and the Supplemental Agreement was paid in full. (DX–18 and PX–199, Supplemental Agreement, ¶ 6). In addition, the Supplemental Agreement extended the exclusive licenses to the full term of the Original Agreement. (DX–18 and PX–199, Supplemental Agreement, ¶ 2).

■ Reading the Original agreement together with the Supplemental agreement, the Court concludes that RCA granted Solarex an exclusive license. The agreements granted Solarex (1) the right to exclude others from making, using and selling the subject matter of the patents, (2) the right to grant sublicenses in the patents to others, and (3) the right to sue infringers. The fact that Solarex's exclusive rights were subject to the rights of pre-existing non-exclusive licenses is not surprising; RCA could not transfer that which it did not own. Nor are the pre-existing non-exclusive licenses fatal to Solarex's status as an exclusive licensee. A license may be exclusive even though the owner had granted a non-exclusive license prior to the exclusive license. *Paul E. Hawkinson Co. v. Carnell,* 112 F.2d 396, 398 (3d Cir.1940). The significant fact is that RCA itself retained no rights in the licensed patents. RCA was precluded, subject to the agreed upon limitations in the case of the government contracts, from granting further licenses in the patents.

Solarex's licenses were not made less exclusive by RCA's prior contracts with the federal government. As RCA points out, these provisions obligating RCA to grant licenses to third parties were so limited by the contract as to be virtually meaningless.

In fact, the provisions had never been invoked by the federal government.

Moreover, both Solarex and RCA, the only two parties to the licensing agreements, believed that the agreements granted Solarex an exclusive license. In its complaint filed on April 15, 1988, RCA alleged: "RCA believes that (a) plaintiff Solarex Corporation ("Solarex") has an exclusive license under the patents in suit in the field of solar cells and panels...." (D.I. 117) (RCA's Complaint in the Alternative, April 15, 1988).

■ Second, and aside from the question of whether Solarex was an exclusive licensee at the initiation of this suit, the Court concludes that considerations involving the policy underpinnings of standing, and judicial economy warrant finding that Solarex has standing. At the outset of the trial, Solarex filed a complaint against RCA and ARCO as defendants. RCA was subsequently realigned as a plaintiff by order of the Court. RCA then filed a complaint raising the same patent infringement claims as Solarex. Therefore, in terms of standing, the Court was assured that it had the real party in interest before it alleging a genuine controversy.

RCA then moved to be dismissed from the suit. Initially, this motion was opposed by ARCO. ARCO argued that such a dismissal would waste the Court's time, and prejudice ARCO. "It would be extremely unfair to ARCO and wasteful of the Court's time to allow a duplicative action to be filed by Solarex after a finding by this Court that Solarex has no standing in *this* suit." (Memorandum of ARCO Solar, Inc. in Opposition to RCA's Motion to Dismiss, at 23 (February 2, 1990)). At a later stage in the litigation, ARCO and RCA reached an agreement whereby ARCO would support dismissal of RCA.[4] Now, after the Court has dismissed RCA,[5] Defendants ask the Court to dismiss Solarex due to lack of standing.

It is clear from reading the Original Agreement together with the Supplemental Agreement and the subsequent assignment of the patents from RCA to Solarex, that Solarex is the real party in interest—the party that has suffered legal injury—and has been so from the outset of the litigation. Thus, as the Defendants so eloquently stated, it would be "wasteful of the Court's time" to now find that Solarex does not have standing in this suit.[6] Equally important, no policy underlying the standing requirement would be furthered by a finding that Solarex does not have standing.

## II. FACTUAL BACKGROUND

### A. Basic Concepts Relating to the Patents [7]

As previously stated, the patents in suit relate to semiconductor devices. Specifically, the devices are photovoltaic devices such as solar cells which have a body of

---

4. Plaintiff Solarex opposed dismissal at this time without a corresponding finding that Solarex had standing.

5. The December 3, 1990 Order reads in relevant part:
 WHEREAS, RCA Corporation, Siemens Solar Industries, L.P., and ARCO Solar, Inc. submitted a proposed order to the Court including the dismissal of RCA Corporation as a party;
 WHEREAS, the Court by Order dated August 7, 1990, had denied a motion to dismiss RCA as a party because defendants ARCO Solar and Siemens Solar had alleged RCA was a necessary party to confer standing;
 WHEREAS, there no longer appears to be any dispute regarding the standing of Solarex Corporation to commence and maintain this action;

IT IS HEREBY ORDERED ... that RCA Corporation is Dismissed as a Party to this Action.
(D.I. 245)

6. The Court finds it especially significant that Solarex is the owner of the patents in suit. Although it did not own the patent rights when it initiated the lawsuit, Solarex filed a supplemental complaint alleging the subsequent assignment from RCA, and the new grounds for standing.

7. All of the information in this section may be found in PX–230, pp. 10–24; Transcript, pp. 647–746; and DX–171 through DX–176. While some references are provided, they are not the exclusive reference available and the Court directs a reader to the above-mentioned portions of the record for further detail.

amorphous silicon fabricated by glow discharge in silane. Some basic information concerning the science pertinent to the patents may prove helpful.

All matter is made from atoms. Atoms are comprised of three particles: protons, which are positively charged; electrons, which are negatively charged; and neutrons. (Transcript, pp. 648–649; DX–171). An atom contains equal numbers of electrons and protons and this number determines the elements identity. (DX–171). The atom's nucleus is comprised of protons and neutrons while the electrons orbit around the nucleus in a determinable manner. (Transcript, pp. 649–650).

The number of electrons is limited per level of orbit. In the first level, a maximum of two electrons are permitted. (Transcript, p. 654). In the second level, up to eight electrons are permitted. (Transcript, p. 654). In the third level, eighteen electrons can be accommodated. If eight are present the atom is considered stable and unlikely to have much physical or chemical interaction with its neighbors. (Transcript, pp. 653–654). Normally, each orbit level is maximized before a new orbit level is begun. Thus, for instance, phosphorous which has fifteen electrons has three orbits: two electrons in the first level, eight in the second, and five in the outermost orbit. (DX–171; Transcript, p. 659). Atoms always strive for a closed shell configuration, in that they desire to be stable through giving away, sharing or receiving electrons in the last orbit until it is filled. (Transcript, pp. 664, 667).

The electrons in the outermost orbit are referred to as valence electrons. (DX–171; Transcript, p. 662). Thus, phosphorous has five valence electrons. Boron, an element with five electrons and protons has three valence electrons residing in the second orbit. (DX–171; Transcript, p. 656). Another element of interest in this case is silicon. Silicon has fourteen electrons with four valence electrons residing in the third orbit. (DX–171; Transcript, pp. 657–658). Electrons in higher orbits possess greater energy than those in the lower orbits. Therefore, valence electrons, because they are in the outermost orbit, possess the greatest energy. (DX–171; Transcript, pp. 651, 672–673).

A molecule is a combination of atoms. Molecules are formed by atoms sharing their valence electrons. (DX–172; Transcript, pp. 667–669). Silane (SiH$_4$), a molecule of interest in this case, is formed by one atom of silicon combined with four atoms of hydrogen. (Transcript, pp. 669–670).

A silicon atom contains fourteen protons and electrons. Thus, there are three orbits of electrons: two in the innermost orbit, eight in the second and four in the outermost orbit. (DX–171; Transcript, pp. 657–658). Crystalline silicon is formed when a large number of silicon atoms are bonded together by each atom sharing their valence electrons. (PX–230, p. 11). Every silicon atom bonds with four nearby silicon atoms forming a geometric crystal called a tetrahedron. (PX–264; Transcript, pp. 111, 672). In crystalline silicon, each silicon atom is held in place at a fixed distance and angle from the neighboring silicon atom. This fixed formation is called a crystal lattice. (Transcript, pp. 110–111; PX–230, p. 11). The distance between silicon atoms in a silicon crystal is measured in angstroms. Each silicon atom in a silicon crystal lattice is approximately 2.35 angstroms away from its neighbor. (Transcript, p. 113). In addition, the angle between silicon atoms in crystalline silicon is 109.47 degrees. (Transcript, p. 113).

Because each silicon atom in crystalline silicon is held at a fixed distance and angle from its neighbor, once you have located one silicon atom in a crystalline silicon you can readily determine the location of its four nearest neighbors making up the tetrahedron. This precise arrangement of one silicon atom with its nearest neighbors in a crystalline silicon is termed short-range order. (Transcript, p. 109). All crystalline silicon possess short-range order.

Crystalline silicon also has long-range order. Long-range order indicates the periodicity of a silicon matrix over the entire extent of the crystal lattice. (Transcript, p. 115). In other words, long-range order de-

scribes the repetition of the pattern over the size of the crystal. (Transcript, pp. 113, 115).

While all forms of crystalline silicon have long range order, the distance over which long range order extends depends upon the type of crystalline silicon. (Transcript, p. 110). There are three types of crystalline silicon: single crystal silicon, polycrystalline silicon and microcrystalline silicon. (Transcript, pp. 120–121). In single crystal silicon, the long range order extends over the entire crystalline structure, which can be as large as eight inches across. (Transcript, p. 120). Polycrystalline silicon has crystallites ranging from 500 angstroms to millimeters or centimeters. (Transcript, pp. 120–121). Finally, microcrystalline silicon has crystallites that range from approximately 30 angstroms to several hundred angstroms. (Transcript, p. 121).

Silicon crystals may be used to convert light into electricity. The effect of light on silicon is dependent upon the energy level of the light. (PX–230, p. 12). When low-energy light is absorbed by the silicon crystal, the electrons gain energy. But, soon the electrons return to their original lower energy levels, giving off heat as the energy they had gained. Thus, the electrical properties of the silicon crystal are not effected. (PX–230, p. 12).

When light of a high enough energy strikes a bound electron, however, the electron is freed from its place in the crystal. (PX–230, p. 12). This results in the silicon bond missing an electron. A bond missing an electron is called a "hole". A hole is free to move about the crystal. (PX–230, pp. 12–13). The freed electron is likewise able to move about the crystal. (PX–230, p. 12). The electrons and holes freed from their positions in the crystal are referred to as electron-hole pairs. (PX–230, p. 13).

The creation of electron-hole pairs is central to the photovoltaic effect. It does not itself, however, produce an electric current. (PX–230, pp. 13–14). In order to produce an electric force and a current, a built-in potential barrier is needed; otherwise, the electrons and holes would travel around the crystal until they lost their energy and returned to their lower energy levels. (PX–230, p. 14). The function of the potential barrier is to separate the electron-hole pairs and send more electrons to one side of the device and send more holes to the other side. (PX–230, p. 14). Separated holes and electrons are less likely to rejoin each other, and more likely to retain their electrical energy. "This charge separation sets up a voltage difference between either end of the cell which can be used to drive an electric current in an external circuit." (PX–230, p. 14).

There are several ways to form a potential barrier. Those that will be discussed here involve the use of dopant atoms. Doping is the deliberate introduction of impurities into the crystal to change its electrical properties. For example, phosphorous or boron may be introduced into the otherwise pure silicon crystal by substituting an atom of phosphorous or boron for an atom of silicon. (PX–230, p. 14). The results vary depending upon which element is introduced.

If phosphorous atoms, which contain one additional valence electron, are introduced into pure crystal silicon, the extra electrons are relatively free to move around the crystal. (Transcript, pp. 675–676). The resulting material is said to have been n-doped, because it contains free negative charges, or electrons. (PX–230, p. 16).

Conversely, if boron, or another element with three valence electrons is introduced an extra hole is created which is relatively free to move around the crystal. (PX–230, pp. 16–17). Because these holes lack the corresponding negatively charged electron, these act as free positive charges travelling throughout the crystal. (PX–230, p. 17). The introduction of an atom containing three valence electrons is called p-doping, because it results in extra positive charges in the silicon crystal. (PX–230, p. 17; Transcript, p. 683).

When a material is n-type doped, the electrons are the majority carriers and the holes are the minority carriers because the electrons outnumber the holes. (PX–230, p. 17). Conversely, in p-type material, the holes, which are positively charged, out-

number the electrons and are considered the majority carriers while the electrons are the minority carriers. (PX–230, p. 17).

When p-type and n-type materials are placed in immediate proximity to each other, a semiconductor junction is created. (PX–230, p. 18). Upon these two materials coming in contact, the free electrons of the n-type material will integrate into the extra holes on the adjacent p-type side, and holes on the p-type side move over to the n-type side. (PX–230, p. 18). The transference of electrons to the p-type side and holes to the n-type side along the junction occurs very quickly and results in a charge imbalance with more negative charges on the p-type side and more positive charges on the n-type side. (PX–230, p. 18).

The process of the charges moving across the junction does not continue indefinitely. (PX–230, p. 18). Charged carriers that have already crossed the junction set up an electric field that acts as a barrier resisting the further flow of charges. (PX–230, p. 18). Thus, as more charges cross the barrier, the barrier increases and it becomes more difficult for other charges to cross. (PX–230, p. 18). Eventually, no more electrons or holes can switch sides as a fixed potential barrier has been created and a state of equilibrium exists. (PX–230, pp. 18–19). At this stage the n-type material adjacent to the junction is negatively charged. (PX–230, p. 19). This barrier at the junction is the method of separating charges during electron-hole generation under illumination, and the key to the photovoltaic effect. (PX–230, p. 20).

When light of sufficient energy strikes a crystalline silicon photovoltaic device an electron-hole pair is created. Generally, the barrier resists crossing of the majority charge carriers. (*Id.*) Therefore, holes or positive charges on the p-type side and electrons on the n-type side have difficulty entering the opposing regions. (*Id.*). On the other hand, the minority carriers (holes in the n-type and electrons in the p-type) are driven by the junction to the opposite side. (*Id.*). Therefore, once the electron-hole pair is created in one of the regions

the potential barrier separates the electrons and holes.

If the electron-hole pair is created on the p-type side, the electron that is free to travel will be drawn across the junction into the n-type region, consistent with the treatment of all minority carriers. (PX–230, p. 21). Likewise, if an electron-hole pair is created on the n-type side, the hole will freely travel and cross the junction onto the p-type side. (*Id.*). All the while, the majority carrier (the hole if concerned with the p-type side and the electron if discussing the n-type side) will be repelled by the barrier and remain on the side where it is created. (*Id.*). Likewise, once the minority carrier has passed across the barrier to the opposite region it too will likely not return to the other side because it will be faced by the repulsion force of the junction's field. (*Id.*). Thus, the likelihood of these electrons and holes recombining is very small because the opposite charges are quickly separated and there is little chance of them encountering the few carriers of opposite charge in the region where they are the majority carrier. (*Id.*).

Through the separation of charges of these light-generated electron-hole pairs, the n-type side contains excess negative charges and there are excess positive charges on the p-type side. (PX–230, p. 22). Thus, an imbalance exists. Connecting the n-type side to the p-type side with an external electrical circuit will cause a current to flow through the circuit as the charged particles move to reduce this imbalance. (*Id.*). Electrons will flow out of the electrode in the n-type region through a load with the ability to perform useful work on that load. The electrons then return to the p-type side, where they recombine with holes, thus completing the circuit. (*Id.*). Through this process, equilibrium is maintained. "The incident light continually creates more electron-hole pairs and, thereby, more charge imbalance; the charge imbalance is relieved by the current, which gives up energy in performing work." (PX–230, pp. 22–23). Thus, a useful current can be continually created and used.

Having discussed the creation of useable current using crystalline silicon, the Court will now consider the use of amorphous silicon to convert light to electricity. Amorphous silicon lacks the same long-range order as silicon crystal.[8] Unlike crystalline silicon where the neighbors of each silicon atom can be determined through use of the fixed length, angle and pattern associated with crystalline materials, amorphous silicon does not contain the same fixed distance and angle between one atom and the neighboring atoms. Thus, the distance between one silicon atom and the next may vary from 2.33 to 2.37 angstroms and the degree will vary 5 to 10 degrees from the fixed bond angle of 109.47 found in crystalline silicon. (Transcript, p. 113).

Likewise, amorphous silicon does not possess the same degree of short range order as crystalline silicon. While one probably can locate the nearest neighbors of any given silicon atom in amorphous silicon, and possibly even the second nearest neighbor, it is unlikely, with any certainty that one could locate the third nearest neighbor. (Transcript, pp. 114–115). Amorphous silicon possesses a short range order of approximately 10–20 angstroms.[9]

Prior to 1974, amorphous silicon was not considered useable for photovoltaic devices because of its lack of long-range order. First, it was generally accepted that it was not possible to create electron-hole pairs in a spatially extended region of amorphous silicon and move both the hole and the electron out of that region. (Transcript, pp. 106, 1375–1376). Further, it was believed that amorphous silicon, like all amorphous materials, was insensitive to doping, making it impossible to create internal barriers by alternating amorphous silicon's conductivity properties. (Transcript, pp. 31, 41, 939–940, 1369).

**8.** If no microcrystallites are detectable (which is believed to not exist below 30 angstroms) in silicon then it is considered to be amorphous silicon. (Transcript, p. 122).

### B. The Inventions

In 1970, Dr. David E. Carlson ("Carlson") began working for RCA doing exploratory research on glasses. (Transcript, p. 23). Sometime in or around 1972, Carlson began working with a technique called glow discharge for the purpose of changing the surface chemistry of glasses. (Transcript, p. 23). Glow discharge is used to ion-deplete the glass, and to deposit films like tin oxide and amorphous carbon directly on the glass, thereby changing the surface chemistry. (Transcript, p. 24).

In 1973, as a result of the Arab oil embargo, Carlson became interested in solar cells as a possible alternative energy source. (Transcript, p. 25). Although Carlson's work at RCA was not directly related to this field, he believed that such an undertaking was within his discretion because he was hired to do exploratory research. (Transcript, pp. 25–26).

The idea of developing a thin film solar cell using glow discharge first occurred to Carlson in May, 1974. (Transcript, p. 25; PX–238). Carlson's practice, which held true during his research efforts in this field, was to document his experiments, the results, and secondary research findings in a laboratory notebook. (PX–238).

Initially, Carlson was not attempting to deposit amorphous silicon. Rather, he first decided to explore the deposition of polycrystalline silicon films by glow discharge in silane. (Transcript, p. 47; PX–238 p. 100565). Carlson believed that if he could obtain polycrystalline silicon that had fairly large crystallites in comparison to the thickness of the film he would have a high-performance solar cell. (Transcript, pp. 26–27).

Because of the similarities between single crystal silicon and polycrystalline silicon Carlson believed that he could use conventional structures such as PN junctions in any device. (Transcript, p. 27, 47; PX–238, pp. 100565, 100569). However,

**9.** The patent describes the amorphous silicon as possessing a short range order of no more than 20 angstroms while plaintiff's expert testified that it was closer to 10 angstroms. (Transcript, p. 109).

Carlson never actually built a device structure at this time. Instead, he only deposited a few polycrystalline films using glow discharge and did some rough characterizations of the material. (Transcript, p. 26).

After some preliminary work, Carlson found that the vacuum system he was using would have to be improved if he were to attain the results he wanted, so he began to rebuild the system. (Transcript, p. 27).

In October 1974, after rebuilding the vacuum system, Carlson again began to deposit films. (Transcript, p. 28). The films were deposited using substrates such as single crystal silicon, tin oxide-coated glass, and aluminum. (Transcript, p. 28). At this time Carlson recorded that he believed a good junction for a solar cell could be obtained if a heterojunction device structure was used, having p-type polycrystalline silicon in contact with n-type tin oxide.

"I started trying to use some structures that I thought would make sense with good quality polycrystalline film. One of the first ones was a structure where I attempted to use p-type polycrystalline silicon, and deposit it on n-type to make a heterojunction device."

(Transcript, pp. 28–29, 49–50; PX–238, p. 100620). Carlson also tried using PN junction, PIN junction, and Schottky barrier devices. (Transcript, p. 29).

At first, Carlson believed his experimentation was successful in that he thought he could see clear evidence of crystallinity in the deposited films. (Transcript, pp. 28, 50; PX–238 p. 100627).

"The attached photos show a scattered crystallite structure ... in the uncoated Ae film region ... and a scattered larger crystallite structure in the Si deposition area...."

(PX–238, p. 100627). On October 28, 1974 when Carlson first reported that he had a working heterojunction device of p-type silicon on tin oxide, he still believed the material to be polycrystalline. (Transcript, pp. 50–51; PX–238, p. 100643). However, when he viewed the device under magnification there was no evidence of crystallinity and he began to doubt whether the material he had was actually polycrystalline. (Transcript, p. 29).

"Further doubt was created when the material virtually did not respond to the infrared spectrum, which is completely inconsistent with polycrystalline silicon." (Transcript, pp. 30, 51–52; PX–238, p. 100671).

In order to identify what material he had, Carlson decided to submit some samples to the RCA characterization lab to have an x-ray analysis done. (Transcript, pp. 30, 52–53; PX–238, p. 100679). The result of this analysis, recorded in Carlson's laboratory notebook on December 19, 1974, showed the material to be amorphous rather than crystalline. (Transcript, pp. 30, 53; PX–238, p. 100679).

"Ron Smith has reported that no [silicon] x-ray patterns are evident in devices 11–5–74 and 12–3–74.... Our [silicon] films may be amorphous!"

Upon discovering that the material was amorphous rather than crystalline, Carlson began a detailed investigation to prove both to his colleagues and himself that the material was in fact amorphous because prior to this time amorphous silicon was thought not to be suitable for solar cell use. (Transcript, pp. 31, 33, 76–78, 106, 1364). In this respect, Carlson began surveying the literature available on amorphous silicon in RCA's technical library in order to compare any reported properties with the results he had achieved. (Transcript, pp. 32–33). The references that Carlson used for comparison purposes were documented in his laboratory notebook. Over the next year, Carlson cited more than thirty different references. (Transcript, pp. 32–33, 54).

One reference in Carlson's notebook was to a 1969 paper by *Chittick, et al.* entitled "The Preparation and Properties of Amorphous Silicon." (Transcript, pp. 33–34). With respect to this article, Carlson testified as follows regarding why such notations were made:

Well, Chittick and his co-worker had published a couple of papers that gave some properties of glow discharged positive amorphous silicons that they

had made. I was very interested in looking at the results in light of this recent information about the microstructure from the x-ray analysis.

I started making a lot of comparisons between properties of our films and Chittick's films as well as films that were deposited by Spear and his colleagues.

There were really two main groups at that time that had done quite a bit of comparison of these glow discharge positive solar cells which I mentioned was the Chittick, et al group as standard telecommunications and the Spear and LeComber colleagues at the University of Dundee in England. They were the two main sources that I was referring to.

Q. What type of characteristics were interesting to you in terms of what was reported in these articles?

A. Well, I had been looking at properties like resistivity and photovoltaic activity, looking at electronic activity.

Chittick did report in some of his earlier works on the resistivity of his films as a function of substrate temperature, and also photovoltaic activity. He had some conical data.

I was looking at data like that and making comparisons in an attempt to, as I say, convince myself and others that these were similar types of materials, these were amorphous silicon type of films rather than polycrystalline type of films.

Q. Dr. Carlson, in a Chittick article it has the effects of doping.

To what extent, if any, did you rely on the alleged doping aspects of the Chittick article?

A. I really didn't at all.

By the time I had found out about the material was amorphous silicon, I had already made a number of device structures. I knew they worked. I had already been doping the material. All of the time I was doping the material, I thought it was polycrystalline silicon. I knew it worked. I knew you could dope it. It wasn't until afterwards that I found out that the material was amorphous.

When I did look through the Chittick paper which had a lot of interesting information in it, I found the information in his section where he was putting phosphorous into the amorphous silicon which I found actually to be somewhat discouraging, because what he showed was some changes. But he also had many statements in there where he said these films were unstable, that they change with time. He had a lot of scatter in his data.

Generally these changes that he observed and his lack of reproducibility were about the same order as these changes that he was reporting where he was putting phosphorous in. My feeling at that time was his paper wasn't very significant to what I was doing.

He hadn't seen any clear-cut affects that I had already seen in my films.

Q. What was the significance of the changes that Dr. Chittick was seeing in regard to his attempts to dope or incorporate phosphorous?

A. Well, at that time, I believe they stated in their paper that they were looking for changes. When they had added phosphorous comparable to what one might expect in other materials like single crystal silicon, the changes that they observed were, as I said, relatively small, more than a million times less than what they were looking for.

So I believe also it sort of taught away from that that this was really something that would be useful. I think it further discouraged one from taking that data and trying to do anything with it.

(Transcript, pp. 34–36).

Further, with respect to the Chittick (1969) paper and its disclosures Carlson testified that a later publication by Spear and LeComber confirmed his views of what Chittick taught with respect to doping amorphous silicon and obtaining a useful resulting material. (Transcript, pp. 39–40).

Carlson believed that the 1975 *Spear and LeComber*'s article entitled "Substitutional Doping of Amorphous Silicon" was the first publication showing that materials like boron and phosphorous could be put into amorphous silicon to change the electronic activity of the material over a wide range. (Transcript, pp. 36–37; PX–7, pp. 704–707). In this article, Spear and LeComber stated the following:

The control of the electronic properties of crystalline semiconductors achieved by doping with substitutional impurities was a most significant factor in the developing of semi-conductor physics and solid state electronics. So far, attempts to control the properties of amorphous tetrahedrally coordinated semi-conductors in the same systematic way have not been successful.

Further, within the article, Spear and LeComber stated that

Several workers in the field have expressed the opinion that amorphous semiconductors may well be insensitive to doping.

(PX–7, p. 704; Transcript, p. 40).

On the basis of the above facts, the Court finds that Carlson had made working devices by October 1974 as documented in his laboratory notebook, although he did not publish his results until June, 1976. (PX–224). Further, the Court finds that Carlson first learned of the Chittick article after having made working devices and after discovering the material he had created was amorphous rather than crystalline.

## III. INFRINGEMENT

Infringement occurs when someone "without authority makes, uses or sells any patented invention within the United States during the term of the patent...." 35 U.S.C. § 271 (1988). Plaintiffs must prove infringement by a preponderance of the evidence. *See, e.g., Smithkline Diagnostics, Inc. v. Helena Labs. Corp.*, 859 F.2d 878, 889 (Fed.Cir.1988). The Court's determination of infringement involves two steps. First, the Court must determine the scope of patent claims in issue. *Autogiro*

*Co. of America v. U.S.*, 181 Ct.Cl. 55, 384 F.2d 391, 401 (1967).

The claims of the patent provide the concise formal definition of the invention. They are numbered paragraphs which "particularly [point] out and distinctly [claim] the subject matter which the applicant regards as his invention." It is to these wordings that one must look to determine whether there has been infringement. Courts can neither broaden nor narrow the claims to give the patentee something different than what he has set forth.... Although courts are confined to the language of the claims, they are not, however, confined to the language of the claims in interpreting their meaning.

. . . .

In deriving the meaning of a claim, we inspect all useful documents to reach what Justice Holmes called the "felt meaning" of the claim.

*Id.* 384 F.2d at 396–397 (quoting 35 U.S.C. § 112). This requires the Court to interpret the language of the asserted claims of the patents. The words in a claim may mean what one skilled in the art would expect the words to mean or the inventor may provide a different meaning to the words. In interpreting the disputed claims, the Court looks to several factors including: (1) the literal language of the claims, (2) the patent specification, (3) the prosecution history, and (4) expert testimony on how those skilled in the art would interpret the claim. *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 867 (Fed.Cir.1985); *McGill, Inc. v. John Zink Co.*, 736 F.2d 666, 673–75 (Fed.Cir.), *cert. denied*, 469 U.S. 1037, 105 S.Ct. 514, 83 L.Ed.2d 404 (1984); *American Standard Inc. v. Pfizer Inc.*, 722 F.Supp. 86, 92 (D.Del.1989). But, "interpreting what is *meant* by a word *in* a claim 'is not to be confused with adding an extraneous limitation appearing in the specification.'" *Intervet America v. Kee–Vet Labs.*, 887 F.2d 1050, 1053 (Fed.Cir.1989) (quoting *E.I. Du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed. Cir.1988)).

Once the Court establishes the meaning of the claim, the claim must be read on the accused products or processes to determine whether the accused products or processes infringe on the patent, either literally or under the doctrine of equivalents. *Autogiro*, 384 F.2d at 401; *Palumbo v. Don–Joy Co.*, 762 F.2d 969, 974 (Fed. Cir.1985). Literal infringement occurs if a claim of the patent reads on the alleged infringer's product or process. A claim reads on an alleged infringer's process if each element of the claim is found in the process. *See American Hoist & Derrick Co. v. Manitowoc Co., Inc.*, 603 F.2d 629, 630 (7th Cir.1979). Infringement under the doctrine of equivalents occurs when the alleged infringer's product or process performs substantially the same function, in the same manner, to obtain substantially the same result as the claimed invention. *Graver Tank & Mfg. Co., Inc. v. Linde Air Prods. Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950). The Court will follow this two-step approach to determine the infringement of the '521 patent, the '844 patent, and the '148 patent.

## A. The '521 Patent

The '521 patent, issued to Dr. Carlson on December 20, 1977, is directed towards semiconductor devices with a junction and a body of amorphous silicon fabricated by glow discharge in silane. (T. 82). Solarex alleges that ARCO Solar has literally infringed Claims 11, 15, 16, and 17, or in the alternative, Claim 9 of the '521 patent.

### 1. Claim Interpretation

Claim 11 of the '521 patent states:

11. A semiconductor device comprising: a body of amorphous silicon fabricated by a glow discharge in silane with a semiconductor junction in said body.

(PX–1, col. 14, 11.58–61).

The dispute over whether ARCO Solar's products infringe Claim 11 of the '521 patent centers around the Court's interpretation of the following three phrases: "semiconductor junction in said body", "comprising a body of amorphous silicon", and "amorphous silicon."

### a. "semiconductor junction in said body"

The specifications accompanying the '521 patent clearly show that there are four types of semiconductor junctions disclosed in the patent: PN, PIN, heterojunction, and a Schottky barrier junction. (PX–1, cols. 2, 7, 9, 11; col. 13, 11.55–58). The Court finds that Claim 11, however, is limited to semiconductor devices with PN and PIN junctions. Dr. Lucovsky testified that PN and PIN junctions are located within the body of a semiconductor device, while the heterojunction and Schottky barrier junctions are located at the surface of the body of the semiconductor device. He testified that one of ordinary skill in the art would interpret "in said body" to refer to PN and PIN junctions. (Transcript, p. 84).[10]

This conclusion is supported by the specification of the '521 patent. The specifications describe four embodiments of the '521 patent. The specifications refer to the Schottky barrier embodiment as "a surface barrier junction." (PX–1, col. 3, 11. 63–64). In discussing the heterojunction barrier embodiment, the specifications state "[o]n the surface of the body [of amorphous silicon] is a semiconductor region." Moreover, the figures provided in the specifications clearly show that the PIN and PN junctions are within the body of amorphous silicon. With such precise distinctions being made in the specifications between junctions "at the surface" of amorphous silicon and "in" the body of amorphous silicon, the Court finds that Claim 11's language "in said body" can only be interpreted as limiting claim 11 to PN and PIN junctions.

10. Claim 9 teaches a heterojunction device where the semiconductor junction is at the surface of amorphous silicon rather than being in the body. This device includes a body of amorphous silicon fabricated by glow discharge in silane and was one of the first working devices constructed by Carlson when he deposited tin-oxide on the body of amorphous silicon. (PX–238, p. 100620; Transcript, pp. 49–51). The Court finds it unnecessary to consider whether ARCO Solar infringed claim 9 because it finds infringement of claims 11, 15, 16 and 17.

### b. "comprising a body of amorphous silicon"

The parties disagree as to whether Claim 11 covers devices where elements other than amorphous silicon are present in the body of amorphous silicon. The Court concludes that '521 patent clearly contemplates that the body of amorphous silicon would have other elements included. (Transcript, 131–33). The specifications describe the use of phosphine and diborane as dopants in the p and n layers, both of which are found within the body of amorphous silicon. (PX–1, col. 1, 11.21–23). Furthermore, as to the meaning of "amorphous silicon", Dr. Lucovsky testified: "to one of ordinary skill in the art ... amorphous silicon was a material produced by one of these three techniques that was predominantly silicon. But certainly the term allowed the incorporation of other elemental species as well." (Transcript, p. 131). Finally, it is well accepted that the word "comprising" as used in Claim 11 is an open-ended term and has the legal significance of permitting elements to be added to the semiconductor device without avoiding infringement. *See Water Technologies Corp. v. Calco, Ltd.*, 850 F.2d 660, 666 (Fed.Cir.) ("the open-ended phrase 'comprising' ... does not, however, exclude the addition of another ingredient which does not materially affect the characteristics of the invention"), *cert. denied*, 488 U.S. 968, 109 S.Ct. 498, 102 L.Ed.2d 534 (1988). Thus, the Court interprets "comprising a body of amorphous silicon" broadly enough to encompass a material that is primarily silicon; but the material may include other incidental elements.

### c. "amorphous silicon"

The parties also disagree as to the meaning of "amorphous silicon" as used in all three patents. Defendants direct the Court's attention to the specifications accompanying the '521 patent where it is stated that amorphous silicon "possesses a short range order of no more than 20 [angstroms]." (PX–1, col. 2, 11. 39–41). Solarex, on the other hand, urges the Court to adopt a more generic interpretation of "amorphous." Solarex directs the Court's attention to the definition of amorphous contained in the '521 specifications which states that "[a]n amorphous material is one which has no long range order in the periodicity of the matrix." (PX–1, Col. 2, 11.38–39).

Dr. Lucovsky testified that the degree of short range order is not as significant in determining the "amorphousness" of a material, as whether the material possesses long range order. He stated that the basic distinction between amorphous materials and crystalline materials is that amorphous materials lack long range order.

The Court concludes that "amorphousness" is defined by the existence of long range order in a particular material. A material is "amorphous" if under the x-ray, electron diffraction, or other similar tests, it is determined to lack long range order. This conclusion is based on Dr. Lucovsky's testimony, and that a lack of long range order is the characteristic of amorphous silicon that has prevented it from being useful in photovoltaic devices.

Thus, Claim 11 includes the following elements as interpreted by the Court: (1) a semiconductor device, (2) comprising a body of amorphous silicon which is predominantly silicon but may include other elements, (3) the amorphous silicon is fabricated by a glow discharge in silane, and (4) the device contains either a PN or PIN semiconductor junction within the body of amorphous silicon.

Claim 15 is directed to the PIN semiconductor junction. It includes all the limitations of Claim 11, and adds the further limitation that the body of amorphous silicon:

> comprises a first doped layer of one conductivity type spaced from a second doped layer of an opposite conductivity type with an "intrinsic" layer between and in contact with the first and second doped layers, such that there is a capability of a spaced charge region being provided in the "intrinsic" layer.

(PX–1, col. 15, 11.4–10). Claim 15 describes a PIN junction which contains three layers: a p-type doped layer, a n-type doped layer

and an undoped or intrinsic layer ("I-layer") between the other layers. (PX-1, col. 8, 11. 30–33; Transcript, p. 195–196). The elements of Claim 15 are identical to Claim 11 except that Claim 15 is limited to a PIN semiconductor junction.

Claim 16 adds to the elements and limitations of Claims 11 and 15 the limitation that "the intrinsic layer is on the order of one micron or less in thickness from said first doped layer to said second doped layer." (PX-1, col. 15, 11.11–14).

Claim 17 is dependent on Claim 16 and therefore includes all of the elements and limitations of Claims 11, 15 and 16. Claim 17 [11] adds two additional elements: it is limited to PIN devices (1) having an electrically conductive substrate on the surface of the second doped layer, and (2) having a solar radiation transmissive electrode on the surface of the first doped layer.

For the purposes of Claim 17, Lucovsky testified that the term "electrically conductive substrate" refers to the electrical contact on the surface of the amorphous silicon body opposite the solar radiation transmissive electrode. Further, he testified that "substrate," as used in Claim 17, indicates that it is on the back or bottom of the solar cell when the device is operational. (Lucovsky, Transcript, 201). The Court finds that Claim 17 limits the placement of electrical contacts needed to facilitate the use of the electric current created by the device.

With this understanding of the claims of the '521 patent, the Court will determine whether these claims literally read on ARCO Solar's thin film solar cells.

### 2. Literal Infringement

Defendants admit that their devices meet all the limitations in Claim 15, 16, and 17,[12] but deny that the body of its semiconductor device is "amorphous silicon" within the meaning of Claim 11. ARCO Solar argued at trial and in its post trial brief that the material it uses in manufacturing the accused solar cells is not "amorphous silicon." [13] They contend that Solarex failed to meet its burden of proof in establishing that the silicon material ARCO used contained a short-range order of less than 20 angstroms as required by the patent.

The Court has concluded, however, that "amorphous", as used in the '521 patent, does not require a specific short range order, but a demonstrable lack of long range order. Solarex presented substantial evidence that ARCO Solar's devices are semiconductor devices comprising a body of amorphous silicon fabricated by a glow discharge in silane with a semiconductor junction, in the form of a PIN junction, in the body of amorphous silicon. (Lucovsky,

11. Claim 17 reads as follows:

> an electrically conductive substrate on a surface of said second doped layer opposite the intrinsic layer; and
> a solid radiation transmissive electrode of good electrical conductivity on a surface of said first doped layer opposite the intrinsic layer.

(PX-1, col. 15, 11. 17–19, col. 16, 11. 1–3).

12. Defendants admit that ARCO Solar's thin film silicon solar cells are semiconductor devices comprising a body of silicon-containing material fabricated by a glow discharge in an atmosphere including silane, with a semiconductor junction in each device. (PX-195(g), Request for Admission Nos. 1, 2, and 10; PX-195(h), Request for Admission No. 30). Defendants admit that the accused devices are PIN semiconductor devices incorporating silicon-containing layers of differing conductivity, in the form of a p layer and an n layer, separated by an undoped I layer. (PX-195(h), Request for

Admission No. 47; PX-195(g), Request for Admission No. 15). Defendants admit that all three layers are fabricated by a glow discharge in a atmosphere including silane. (PX-195(g), Request for Admission No. 1; PX-195(h), Request for Admission No. 30). Defendants also admit that the undoped layer was one micron or less in thickness. (PX-195(g), Request for Admission No. 7)).

13. Defendants initially advanced two bases for their claim of noninfringement. They claimed that the patent was not infringed because the body of amorphous silicon contained extraneous elements. In addition, they claimed that the material ARCO used did not satisfy the patents' definition of amorphous silicon because there was no evidence that it had a short range order of less than 20 angstroms. The Court concludes the first argument lacks merit in light of the evidence presented at trial. Apparently, Defendants agree, as they did not address this matter in their post trial brief.

Transcript, 186–188, 226–227). The evidence presented by Plaintiffs on the issue of "amorphousness" of ARCO's silicon included test results relating to the ARCO Solar devices as well as the testimony of their expert, Dr. Lucovsky. An electron diffraction test performed on the ARCO thin film solar cells indicated that the ARCO solar cells were made from amorphous silicon because they did not display a diffraction pattern. (Lucovsky, Transcript, 150–152, 155, 167–168). Other test data presented demonstrated that the lack of long range order present in ARCO Solar's silicon material included (1) Raman scattering (Transcript 138–168) and (2) transmission electron imaging (micrographs). (Lucovsky, Transcript, 139–149, 155, 171–173).

Based on Dr. Lucovsky's uncontroverted testimony, and the data presented at trial, the Court finds that the body of amorphous silicon used in ARCO's solar cells lacks long range order, and is therefore "amorphous silicon" as that term is used in all the three patents at issue. Thus, because ARCO's solar cells meet each of the elements in Claims 11, 15, 16 and 17, the Court finds ARCO's products literally infringe the '521 patent.

### 3. Doctrine of Equivalents

■ In the alternative, the Court holds that the ARCO Solar devices infringe Claims 11, 15, 16, and 17 of the '521 patent under the doctrine of equivalents, because ARCO Solar's thin film silicon devices perform the same function in the same way as the claimed invention to achieve the same results.

First, ARCO's solar cells perform the same function as the '521 patent. ARCO Solar's thin film silicon semiconductor devices are designed to convert solar radiation into usable electrical energy. (Lucovsky, Transcript, 178–181, 191–93).

Second, the ARCO Solar devices function in substantially the same way as the device described in the '521 patent. The operation of the PIN device is based on the function of the three layers. The I-layer, which is photoactive, absorbs the light generating the electron-hole pairs. These pairs are separated by the field that exists in that region. Then, the electrons and holes are transported into the p and n regions. The p and n regions set up the potential step and their conductivity allows the transportation of current. The transparency of the p-layer (established by the addition of carbon) enables the light to pass to the I-layer. (Lucovsky, Transcript, 193–194). This means of achieving the desired function is the same means provided for in the '521 patent. (PX–1, col. 8, 11.21–47).

Finally, substantially the same results are achieved by ARCO's devices as by the device described in the '521 patent. The operation of the PIN device in the ARCO process, like the operation of the claimed device, generates current and develops power conversion efficiency to enable the devices to function as solar cells for converting solar radiation into usable electrical energy. (Lucovsky, Transcript, 192–193).

### B. The '844 Patent

The '844 patent was issued to Dr. Carlson on March 2, 1982. The claims in the '844 patent describe a method of fabricating an amorphous silicon semiconductor device described in the '521 patent. (Transcript, p. 82–83). Plaintiffs have asserted that ARCO Solar's thin film silicon solar cell manufacturing process infringes independent Claim 1 and dependent Claims 3 and 6 of the '844 patent, both literally and under the doctrine of equivalents.

### 1. Claim Interpretation

Claim 1 of the '844 patent is directed to a method of making an amorphous silicon semiconductor device incorporating a rectifying junction. Claim 1 reads as follows:

1. A method of fabricating an amorphous silicon semiconductor device incorporating a rectifying junction, said method comprising:

placing an electrically conductive substrate in a glow discharge apparatus;

reducing the pressure in said apparatus to a pressure of from about $10^{-3}$ to about $10^{-6}$ Torr;

heating said substrate to a temperature of from about 150° to about 450° C.;

initiating a glow discharge in an atmosphere including silane at a pressure of about 0.1 to about 0.5 Torr so as to form a body of amorphous silicon on said electrically conductive substrate;

continuing said glow discharge while altering the relative proportion of silane and conductivity modifiers such that said body has layers of differing conductivity, said layers forming rectifying junction; and

fabricating an electrical contact to said body of amorphous silicon opposite to the surface contacting said electrically conductive substrate.

The method recited in Claim 1 includes six processing steps: (1) placing an electrically conductive substrate in a glow discharge apparatus; (2) reducing the pressure in the apparatus from about $10^{-3}$ to about $10^{-6}$ Torr; (3) heating the substrate from a temperature of 150° to about 450° C; (4) initiating a glow discharge in an atmosphere including silane to form a body of amorphous silicon on the electrically conductive substrate; (5) continuing the glow discharge while altering the relative proportion of silane and the dopants (e.g. phosphorous or boron) to form a body of amorphous silicon with layers of differing conductivity; and (6) attaching an electrical contact to the body of amorphous silicon opposite the electrically conductive substrate. (PX–3, col. 14, 11. 4–23).

A determination of whether Defendants have infringed this process requires the Court to examine steps (1) and (5) in detail.

### a. (1) "Placing an electrically-conductive substrate in a glow discharge apparatus."

There was some disagreement at trial as to the meaning of the word "substrate" as used in Claim 1. Defendants claim that its device does not have a substrate, but a "superstrate." The Court, however, finds that the difference claimed by the Defendants is one of semantics, not of substance.

Dr. Lucovsky testified that an ordinary person skilled in the art would interpret "substrate" to mean the "deposition substrate" or the "entity onto which the film—

the different layers of silicon are deposited." (Transcript, p. 225). This interpretation is supported in the specification accompanying the '844 patent. The specification explains that the first step in Claim 1 is to place a transmissive electrode on the heating plate in the glow discharge apparatus. The electrode described in this embodiment is a layer of tin oxide on glass. The specification explains that the glass side of the electrode is in contact with the heating plate, and that the first deposition (p-layer) is deposited onto the tin oxide side of the electrode. The remaining layers follow.

When the device is operational, the "substrate", (in this example, the glass layer) actually faces upwards toward the sun. Thus, while in operation, the "substrate" might be called a "superstrate." Nonetheless, it is clear from the specifications, the drawing, and Dr. Lucovsky's testimony that "electrically conductive substrate" refers to the item upon which the remaining layers of the device are deposited in the deposition chamber.

### b. (5) "Continuing said glow discharge while altering the relative proportion of silane and conductivity modifiers such that said body has layers of differing conductivity."

The parties disagree as to the scope of Step 5. Defendants contend that this step does not contemplate processes in which the glow discharge is interrupted between the p-layer and n-layer deposits. They contend that "continuing" as used in Claim 1 requires that the glow discharge be sustained without interruption from the start of the deposition of the p-layer through the completion of the deposition of the n-layer. Conversely, Solarex claims that Step 5 is broad enough to include both processes where the glow discharge is uninterrupted and those where it is interrupted.

Defendant's interpretation of continuing does not comport with the description of the invention found in the specification. One of the embodiments of the invention, as disclosed in the specifications, includes an interruption of glow discharge between each layer.

*A glow discharge is initiated* in the vacuum chamber 32 for about one to two seconds with a current density of about 0.5 ma/cm$^2$ at the surface of electrode 228 for deposition of the first doped layer 252 on the order of a few hundred angstroms in thickness.

The atmosphere in the vacuum chamber 32 is then pumped out by the mechanical pump 46. The chamber 32 is brought to a pressure of about $10^{-6}$ torr and silane with about 0.01 percent phosphine is then bled into the chamber 32 at a pressure of 0.1 to 5 torr. *The glow discharge is initiated* for about 1 to 30 minutes with a current density of from 0.3 ma/cm$^2$ to 3.0 ma/cm$^2$ at the surface of the first doped layer 252, thereby the second doped layer 254 is deposited of a thickness of about one micron.

Next, phosphine is bled into the vacuum chamber 32 so that there is a 1.0 percent mixture of phosphine with the silane. *Again a glow discharge is initiated* with a current density of from 0.3 ma/cm$^2$ at the surface of the second doped layer 254 for the deposition of the third doped layer 258 a thickness of a few hundred angstroms.

(PX–2, col. 6, 11. 20–41) (emphasis added).

Moreover, Dr. Lucovsky testified that one skilled in the art would not interpret "continuing" to mean "without interruption between layers." (Transcript, p. 236). Nor does the plain meaning of "continuing" require the Court to adopt ARCO Solar's interpretation. Continuing as read in Step 5 could reasonably mean to proceed with the glow discharge through the deposition of each layer, until the body of amorphous silicon is formed. It does not state, nor infer, whether or not the glow discharge is to be stopped between the deposition of each layer. After reviewing the specifications, listening to the expert testimony, and considering the plain meaning of "continuing", the Court finds that the word "continuing" as used in Claim 1 includes those processes in which the glow discharge is interrupted between the p-layer and n-layer deposits.

Dependent Claim 3 of the '844 patent further limits that:

> [t]he method of fabrication in accordance with Claim 1 wherein phosphine is included with the silane with the concentration of the phosphine being in the range of 0.1 to 1.0% of the silane-phosphine atmosphere, so that said body is doped with phosphorous.

(PX–3, col. 14, 11.29–33). Claim 3 requires a specific concentration (0.1 to 1.0%) of phosphine gas when one of the layers is doped with phosphorous. The use of the phosphine within this range creates the n-layer. (Transcript, pp. 675–676).

Claim 6 of the '844 patent includes all the limitations of Claim 1 and adds the limitation that:

> a layer of p-type amorphous silicon is fabricated on said electrically conductive substrate, a layer of intrinsic amorphous silicon is fabricated on said p-type layer and a layer n-type amorphous silicon is fabricated on said intrinsic layer, said layers forming said body of amorphous silicon.

(PX–3, col. 14, 11.46–52). Claim 6 merely identifies more particularly the steps of fabricating the PIN device in accordance with the method outlined in Claim 1.

2. Literal Infringement

a. *Claim 1*

■ (1) Step 1. Defendants admit that its process includes the step of placing an electrically conductive material in the deposition chamber as provided in Step 1 of Claim 1 of the '844 patent. They do not admit it was a substrate. Testimony presented at trial, however, demonstrated that it was this coated glass material upon which the various layers of amorphous silicon are deposited. As the Court has interpreted "substrate" as used in the '844 patent to refer to the entity upon which the layers of amorphous silicon are deposited, it is clear that ARCO's material is a substrate. Therefore, ARCO's process satisfies Step 1 of Solarex's '844 patent.

(2) Steps 2 and 3. Defendants admit that Steps 2 and 3 of Claim 1 are present in ARCO Solar's process. (PX–195(g), Re-

quest for Admission No. 9; PX–195(h), Request for Admission No. 29).

(3) Step 4. ARCO's process includes a step of initiating a glow discharge in silane as outlined in Step 4. (PX–195(g), Request for Admission No. 9; PX–195(h), Request for Admission No. 30). ARCO claims non-infringement on the grounds that its process during various periods included an extra step before initiating glow discharge in silane. ARCO's process included a glow discharge in hydrogen before the p-layer deposition. (PX–49, at 054541; Transcript, p. 1184).

This additional step does not avoid infringement, however. Claim 1 is an open claim in that prior to listing the steps, Claim 1 states "said method *comprising.*" The Court has already concluded that comprising is an open-ended term that should be read broadly. The Court interprets this term to allow additional steps so long as the steps do not materially alter the invention. ARCO's initial step of a glow discharge in hydrogen does not materially alter the invention. Therefore, the inclusion of this extra step in ARCO's process does not avoid infringement.

(4) Step 5. Defendants argue that Claim 1 requires the glow discharge to be sustained continuously and without interruption. With one exception,[14] Defendants have not continued glow discharge in the matter described in Claim 1. ARCO's process provides for the glow discharge to be turned off between the deposition of the p-layer and the I-layer and between the deposition of the I-layer and the n-layer. Thus, Defendants contend that Claim 1 does not read on ARCO's process.

Plaintiffs, on the other hand, assert that Defendants cannot avoid infringement based on the word "continuing," because the word is broad and includes the concept of interruption of the glow discharge between each layer. The Court has interpreted "continuing" to include even those processes where the slow discharge is interrupted between layers. Under this interpretation, ARCO Solar's process includes Step 5 of the invention.

(5) Step 6. ARCO Solar's process includes the final step of attaching an electrical contact to the body of amorphous silicon. (PX–195(h), Request for Admission No. 32).

Each of the steps of the method claimed in the '844 patent, as interpreted by the Court, are present in ARCO Solar's process for fabricating thin film amorphous silicon cells. Therefore, the Court concludes that Defendants have literally infringed Claim 1.

### b. *Claim 3*

Defendants admit that their process includes all the elements in Claim 3, except that Defendant's deposition atmosphere includes methane as well as silane and phosphine. The inclusion of methane gas in the glow discharge atmosphere does not avoid infringement. Claim 1 uses language that the Court finds to be open and inclusive. Claim 1 specifies an atmosphere *"including* silane." (DX–3). In addition Claim 1 uses the term "comprising" which the Court has already noted is an inclusive term. (DX–3). Therefore, the Court finds Defendants have literally infringed Claim 3.

### c. *Claim 6*

Defendants have also admitted that the ARCO Solar's process meets the additional limitations of Claim 6, except they contend that the layers in their process are not "amorphous silicon." For the reasons discussed regarding the claims of the '521 patent, the Court finds that Defendants' process did involve "amorphous silicon" as defined in the '521 and '844 patents.

---

**14.** Defendants admit that during a two month period in 1987, the glow discharge of the manufacturing process was continued while the relative proportion of silane and conductivity modifiers were altered within the deposition chamber to form a junction. Defendants claim that the product produced during the two month period was segregated and placed in a bonded inventory warehouse. (Transcript, p. 1185). Plaintiffs do not controvert this statement of the facts.

As each of the elements in Claims 1, 3, and 6 of the '844 patent read on ARCO's process, the Court finds that ARCO's manufacturing process literally infringes the '844 patent.

### 3. Doctrine of Equivalents

■■■ The Court holds, in the alternative, that the ARCO process infringes Claims 1, 3, and 6 of the '844 patent under the doctrine of equivalents. First, ARCO's process performs the function of fabricating an amorphous silicon semiconductor device which includes a rectifying junction. (Lucovsky, Transcript, 238, 240, 246). This is the function of the '844 patent, as stated in Claim 1.

Second, Dr. Lucovsky testified for Plaintiff that ARCO's process achieves substantially the same results as the process claimed in Claims 1, 3 and 6. (Transcript, pp. 238–40, 245–46). Like the claimed method, ARCO's process achieves the result of manufacturing an operating solar cell device capable of transforming sunlight into energy.

Moreover, the ARCO Solar process achieves this result in substantially the same way. The primary distinction between ARCO's process and that outlined in the '844 patent is ARCO's claimed discontinuous glow discharge. Mr. Tanner admitted, however, that the ARCO's process works in substantially the same way as Solarex's process. (Transcript, p. 1260).

### C. The '148 patent

The '148 patent was issued to Dr. Carlson on August 12, 1980. It claims an improvement in glow discharge-deposited amorphous silicon solar cells that results in higher efficiencies and improved stability. (PX–3, col. 1, 11. 54–62; col. 6, 11. 31–35). Plaintiffs contend that ARCO's solar cells fabricated by the manufacturing process described above literally infringe Claims 1, 2, 3, and 8 of the '148 patent.

### 1. Claim Interpretation

Claim 1 of the '148 patent contains two parts. The first part recites:

In an amorphous silicon solar cell which comprises an electrically conductive substrate, a layer of glow discharge deposited hydrogenated amorphous silicon having regions of differing conductivity with at least one region of intrinsic hydrogenated amorphous silicon, said layer of hydrogenated amorphous silicon having opposed first and second major surfaces where said first major substrate, and means for electrically contacting said second major surface....

(PX–2, col. 6, 11. 22–32). The second part of Claim 1 provides that:

the improvement wherein the intrinsic hydrogenated amorphous silicon region is compensated with a suitable p-type dopant in a concentration sufficient to reduce the space charge density under illumination to substantially neutral.

(PX–2, col. 6, 11. 31–35). Claim 1 teaches (1) a silicon solar cell, (2) which incorporates a region of intrinsic hydrogenated amorphous silicon compensated with p-type dopants, (3) such that the space charge density under illumination is substantially neutral. Compensating the intrinsic region with a p-type dopant increases the space charge layer of the solar cell under illumination, and reduces the degradation of the photovoltaic properties of hydrogenated amorphous silicon. The result is increased efficiency of the solar cell.

The second element of Claim 1 must be examined more closely. Specifically, the Court must decide the meaning of "intrinsic ... region is compensated." Defendants argue that Claim 1 of the '148 patent requires the "intentional" addition of p-type dopants to the I-layer. Defendants claim that:

"p-type dopants tend to be included within the intrinsic layer of a thin film silicon PIN device whenever the device is fabricated by depositing the p-layer first, as taught in the '521 Carlson patent which is prior art to the '148 Carlson patent." (Defendant's Post Trial Brief. p. 129, ¶ 230). Defendants further assert that "the only process described in the specification of the '148 Carlson patent for compensating an intrinsic region is the *inten-*

*tional* addition of a p-type dopant to the gas atmosphere used to deposit the region." (*Id.* at ¶ 231).

Plaintiffs counter that ARCO's intentions are irrelevant. Plaintiffs rely on a well-settled principle in patent law that one does not have to intend to infringe to be liable for infringement. (Plaintiff's Post Trial Brief, p. 127 (citing *Blair v. Westinghouse Elec. Corp.*, 291 F.Supp. 664, 670 (D.D.C. 1968))).

The Court interprets Claim 1 to speak to an improvement of the '521 patent, which is the existence of a compensated I-layer, not to a *method* as Defendants suggest. Although the specification of the '148 patent discusses one method of achieving this compensated I-layer, Claim 1 is not limited to that method. *See Intervet America v. Kee–Vat Labs.*, 887 F.2d 1050, 1053 (Fed. Cir.1989) ("interpreting what is meant by a word in a claim 'is not to be confused with adding an extraneous limitation appearing in the specification.'") (quoting *E.I. Du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed.Cir. 1988)). Thus, whether ARCO Solar arrived at this compensated intrinsic layer by knowingly injecting boron into the deposition atmosphere, or by leaving boron residue in the chamber prior to depositing the I-layer, is irrelevant.

Claim 2 of the '148 patent covers a solar cell, described in Claim 1, where:

the p-type dopant concentration is less than about $1.2 \times 10^{18}$ atoms per cubic centimeter in the compensated intrinsic hydrogenated amorphous silicon.

(PX–2, col. 6, 11.36–39).

Claim 3 covers a solar cell described in Claim 2 where, in addition:

the p-type dopant concentration is from about $4 \times 10^{15}$ to about $1.2 \times 10^{18}$ atoms per cubic centimeter of the com-

pensated hydrogenated amorphous silicon.

(PX–2, col. 6, 11.40–43).

Claim 8 of the '148 patent covers a solar cell describe in Claim 1, where:

the compensated intrinsic hydrogenated amorphous silicon region is from about 300 to about 1,000 nanometers thick.

(PX–2, col. 7, 11.1–4).

### 2. Literal Infringement

#### a. Claim 1

■ Defendants do not contest that its devices are (1) silicon solar cells, (2) with intrinsic region having space charge density of substantially neutral. Defendants allege there is no infringement, however, because they did not intentionally compensate the intrinsic layer with a p-type dopant. The Defendants' argument lacks merit because Claim 1, as interpreted by the Court, *does not require intentional compensation.*

Plaintiff presented evidence that ARCO's Solar cells contain boron (a p-type dopant) in the I-layer. (Transcript, pp. 259–61, 269–71, 279). Dr. Charles Magee, an expert in the performance of secondary ion mass spectrometry (SIMS) analysis, performed the SIMS analysis on ARCO Solar's commercial solar cells. SIMS is a standard technique for determining the concentrations of various atoms in semiconductor devices. (Lucovsky, Transcript, 256; Magee Transcript, 1079–80). Dr. Magee determined that the concentration of boron in the I-layer fell within the range specified in the '148 patent.[15] (PX–18, Tab 1G, at 900212; Transcript, 431–32).

Moreover, Plaintiffs argue that Defendants did intentionally compensate the intrinsic layer with boron as taught by the '148 patent. Through the testimony of Mr. Tanner, the Plaintiffs established that ARCO Solar's devices were compensated with boron, and that this resulted from a procedure whereby ARCO Solar did not clear the reactor chamber between the de-

---

**15.** Defendants challenged the SIMS analyses because the N-layer contained a greater amount of boron than the P-layer. Pl. br. 104. But, the Court accepts Dr. Lucovsky's and Dr. Magee's explanation of the variances caused by the con-figuration of the solar cell (resulting in low boron readings in the P layer) and the presence of dust on the N layer (resulting in higher readings of boron in the N layer).

position of the p-layer and deposition of the I-layer.[16] Plaintiffs also presented evidence that ARCO did clear the deposition chamber between layers in the manufacturing of other devices. A reasonable inference drawn from this evidence is that ARCO did intentionally compensate the I-layer. Therefore, even if Claim 1 were to require this intention, ARCO has still infringed.

### b. Claims 2 and 3

Plaintiffs presented substantial and uncontroverted evidence that Defendants' solar cells contain boron in the I-layer in amounts well within the parameters cited in Claims 2 and 3 of the '148 patent. (Transcript, pp. 259–61, 269–71, 279, 431–32, 1079–80); PX–18). Therefore, the Court finds that Defendants' amorphous silicon solar cells infringe Claims 1, 2 and 3 of the '148 patent.

### 3. Doctrine of Equivalents

 The Court holds, in the alternative, that ARCO Solar's devices infringe Claims 1, 2, and 3 of the '148 patent under the doctrine of equivalents. ARCO Solar's devices perform the same function, achieve substantially the same result in substantially the same was as the claimed improvement in the '148 patent.

The I-layers of ARCO Solar's cells include a small amount of boron (a p-type dopant) within the range of concentrations specified in the '148 patent. This reduces the space charge density under illumination to substantially neutral, resulting in a more efficient solar cell.

### IV. WILLFUL INFRINGEMENT

 Plaintiff contends that Defendant's manufacturer of thin film solar cells using amorphous silicon constitutes not only infringement but willful infringement, and requests an award of attorneys fees and treble damages. Under 35 U.S.C. § 285, the Court may increase the damages in an infringement action up to three times the amount assessed. 35 U.S.C. § 285 (1988). The Court of Appeals for the Federal Circuit has established a "totality of the circumstances" test to determine the willfulness of an infringement. *Shiley, Inc. v. Bentley Labs., Inc.,* 794 F.2d 1561, 1568 (Fed.Cir.1986), *cert. denied,* 479 U.S. 1087, 107 S.Ct. 1291, 94 L.Ed.2d 148 (1987); *see also American Standard Inc. v. Pfizer Inc.,* 722 F.Supp. 86, 106 (D.Del.1989). The Federal Circuit has utilized three factors to guide its decision under the totality of the circumstances:

> (1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed, and (3) the infringer's behavior as a party to the litigation.

*Bott v. Four Star Corp.,* 807 F.2d 1567, 1572 (Fed.Cir.1986). Stated another way, "[w]illfulness is established only where it is shown that there was a deliberate purpose to infringe, and such a purpose is not found where the validity of the patent and any possible infringement is open to honest doubt." *International Mfg. Co. v. Landon, Inc.,* 336 F.2d 723, 728 (9th Cir.1964), *cert. denied,* 379 U.S. 988, 85 S.Ct. 701, 13 L.Ed.2d 610, *reh'g denied,* 380 U.S. 938, 85 S.Ct. 936, 13 L.Ed.2d 825 (1965).

Clarifying the test even more, the federal circuit has stated that one who has actual notice of another's patent rights has an affirmative duty to exercise due care to determine whether his contemplated activity would infringe those patent rights. *Un-*

---

16. It is accepted that ARCO Solar did not add diborane during deposition of the I layer. Mr. Tanner testified, however, that ARCO Solar manufactures its solar cells by depositing the P, I and N layers in the same reactor chamber. (Transcript, p. 1181–1184). The P layer of ARCO Solar's PIN device was deposited using a mixture of diborane and silane. (Transcript, p. 1182). During this P layer deposition, the sur- faces of the reactor chamber are coated with boron. ARCO Solar then deposits the I layer by discharging silane into the same reactor chamber. (Transcript, pp. 1182–83). Unless steps are taken to remove the boron in the reactor chamber prior to depositing the I layer, the boron residue mixes with the silicon and forms an I layer containing boron. (Tanner Dep. Vol. 2, pp. 110–111).

*derwater Devices Inc. v. Morrison–Knudsen Co., Inc.,* 717 F.2d 1380, 1389 (Fed.Cir. 1983). Exercise of due care would include obtaining an opinion from an attorney that the contemplated activity would not infringe, or that the patent in question is invalid. *Machinery Corp. of America v. Gullfiber AB,* 774 F.2d 467, 472 (Fed.Cir. 1985). Plaintiffs have the burden of establishing willfulness by clear and convincing evidence. *Shatterproof Glass Corp. v. Libbey–Owens Ford Co.,* 758 F.2d 613 (Fed.Cir.1985), *cert. dismissed,* 474 U.S. 976, 106 S.Ct. 340, 88 L.Ed.2d 326 (1985).

Applying this standard to the facts of this case, the Court concludes that ARCO did not willfully infringe the three patents in suit. The facts are in dispute as to when ARCO began manufacturing amorphous silicon cells, and at what point in its decision making process it requested advice from counsel. The Court finds that ARCO solar investigated and researched the manufacture of thin film amorphous silicon cells with the knowledge that RCA, along with others, possessed valid patents in the art. The Court also finds that ARCO eventually manufactured thin film cells that infringed on these patents. But, ARCO did investigate the patents preliminarily in 1981,[17] and again in 1984. Moreover, it is apparent from the prior art references discussed by both parties that production of amorphous silicon solar cells was the technology of the day and many scientists and manufacturers in the field were attempting to break into it. In light of these circumstances, the Court concludes that Solarex has not shown by clear and convincing evidence that ARCO deliberately copied RCA's solar cell design, or deliberately ig-

nored its duty of due care to avoid infringement.[18]

The Court will now discuss the affirmative defenses raised by Defendants of invalidity and unenforceability.

## V. INVALIDITY

ARCO has asserted several affirmative defenses with respect to the validity of two of the three patents at issue. Defendants contend that Claim 11 of the '521 patent in this suit is invalid, under 35 U.S.C. § 102, because it was anticipated by printed publications. In addition, Defendants contend that Claims 11, 15, 16, and 17 of the '521 patent are invalid, under 35 U.S.C. § 103, because they were obvious in light of the pertinent prior art.[19] The Court will examine the challenges to the validity of the '521 patent and the '148 patent.[20]

■ Dr. Carlson's patents are entitled to a presumption of validity. 35 U.S.C. § 282 (1988). Defendants, therefore, have the burden of proving invalidity by clear and convincing evidence. *Custom Accessories, Inc. v. Jeffrey–Allan Industries, Inc.,* 807 F.2d 955, 961 (Fed.Cir.1986).

### A. The '521 Patent

#### 1. Anticipation, § 102

■ Defendants contend that the Claim 11 of the '521 patent is invalid under 35 U.S.C. § 102. Section 102 provides in pertinent part that one is entitled to a patent "unless ... the invention was ... described in a printed publication in this country ... before the invention thereof by the applicant for patent, or ... was described in a printed publication ... more

17. Although the preliminary investigation showed that ARCO's initial idea might be covered by two RCA patents, it is not clear that ARCO had engaged in any infringing activity as of this time, or had even made the decision to manufacture its thin film amorphous silicon cells as of this time.

18. Plaintiffs also request attorneys fees. The Court reserves ruling on this issue until conclusion of the damages phase of the trial.

19. Defendants have challenged the validity of all of the claims of the '521 patents. The Court will

not consider the validity of claims which Plaintiffs have not asserted under its charge of infringement. *See Grain Processing Corp. v. American Maize–Prods. Co.,* 840 F.2d 902, 905–906 (Fed.Cir.1988). The Court will only consider the validity of claims 11, 15, 16, and 17 of the '521 patent, because Plaintiffs have withdrawn the other claims from its charge of infringement.

20. The Court will not consider the challenges to the validity of the '844 patent, because Defendants did not pursue this affirmative defense during trial or in its post-trial briefing.

than one year prior to the date of the application for patent in the United States...." To establish anticipation Defendants must prove that the Chittick (1969) paper and Lecomber and Spear's 1972 article were "printed publications" which contained all the elements of the '521 product. *Mannesman Demag Corp. v. Engineered Metal Prods. Co., Inc.*, 605 F.Supp. 1362, 1367–68 (D.Del.1985), *aff'd*, 793 F.2d 1279 (Fed.Cir.1986); *see also Diversitech Corp. v. Century Steps, Inc.*, 850 F.2d 675, 677 (Fed.Cir.1988).[21] Every element of the claimed invention must be disclosed in a single prior art reference. *Id.*

Claim 11 describes the deposition of amorphous silicon and the advantages of deposition using the glow discharge method. Specifically, Claim 11 distinguishes between junctions which are in the body of amorphous silicon (the PIN and PN junctions) and those that are at the surface of the body (the heterojunction and Schottky barrier junctions). (PX–1, col. 1, ll. 42–45; Transcript, pp. 84–86).[22] Defendants contend that Claim 11 was anticipated by the *Chittick et al.* (1969) paper ("Chittick (1969)") and *LeComber, Madan and Spear*'s 1972 article ("Lecomber and Spear (1972)"), which allegedly described the invention more than one year prior to the date of the '521 patent application.[23]

#### a. Chittick (1969)

The Chittick (1969) paper describes a glow discharge process for depositing films of amorphous silicon from silane gas on substrates at deposition temperatures between 25°C and 650°C. (DX–55). The paper reports on resistivity, temperature coefficient of resistivity and photoconductivity, as well as various other properties of amorphous silicon produced by this process. (DX–55; Transcript, p. 1353).

Defendants argue that Dr. Paul's testimony supports their claim that Claim 11 was anticipated by Chittick (1969): Dr. Paul stated that a Schottky barrier existed in the cell consisting of the aluminum metal, which Chittick applied to his amorphous silicon body in the glow-discharge deposited silicon cell. Plaintiff's expert, Dr. Lucovsky, testified that the paper does not disclose any type of semiconductor device or semiconductor junction as required by Claim 11 of the '521 patent. Further, Plaintiffs' expert testified that there was no disclosure of any effects of a semiconductor junction in or at a body of amorphous silicon, as there was no evidence of a rectification or photovoltaic effect. (Transcript, pp. 1352, 1354–1358).

Although defendants' expert, Dr. Paul, agreed that the presence of a rectification effect would indicate that a semiconductor junction was present, he testified that there was evidence of a rectification effect in the materials Chittick used for the preparation of his 1969 article. (Transcript, p. 1525, 1528). Dr. Paul specifically made reference to a 1970 article by LeComber and Spear entitled "Electronic Transport in Amorphous Silicon Films." (Transcript, pp. 1528–1536; DX–53).

Dr. Paul testified that in LeComber and Spear's 1970 article, the authors reported on amorphous silicon prepared by glow discharge. LeComber and Spear produced the test materials, obtaining them from the Chittick (1969) paper. (Transcript, pp. 1528–1530). However, on cross examination, Dr. Paul testified as follows:

> I don't think I testified that they measure any one of the specific samples described in the 1969 Chittick paper. That was not my testimony. I said they measured samples that were given them by the STL group at Harley.

---

**21.** A "printed publication" is a publication that is sufficiently accessible to members of the public who are interested in the art and exercise "reasonable diligence." *In re Hall*, 781 F.2d 897, 900 (Fed.Cir.1986).

**22.** For further discussion of claim 11, see text, *supra* at 267–269.

**23.** Plaintiff also addresses a 1970 Chittick article, and other prior art references, including a Fisher article. Because Defendants have not relied on these prior art references, the Court will not address the issue of validity with respect to these references.

My evidence is only in reference 14 [of DX-53].

(Transcript, p. 1537).

The Court finds that Dr. Paul's testimony about the disclosures in LeComber and Spear's 1970 article regarding the materials Chittick used to develop his 1969 paper is speculative, at best. Although Dr. Paul was firm in his belief that the disclosures in the LeComber and Spear article directly related to the materials used by Chittick in 1969, the Court finds that such an opinion is unreliable based on the record.[24]

The Court finds that Chittick measured bulk properties of amorphous silicon. Chittick used two types of test structures. (Transcript, pp. 810, 1354–1358; DX-55). For the first structure, Chittick deposited amorphous silicon on glass substrates with two aluminum metal contacts on top of the silicon (referred to as the co-planar design). (Transcript, pp. 810, 1354–1358; DX-55). For the second structure, aluminum contacts were placed on the upper and lower surfaces of the amorphous silicon (referred to as the parallel planar design). (Transcript, pp. 810, 1354–1358; DX-55). The Court finds, based on Chittick's experimental objectives, that the 1969 Chittick materials were ohmic and did not show any rectification effect. The Court concludes there was no disclosure of a semiconductor junction in or at the body of amorphous silicon, nor was a Schottky barrier disclosed within the Chittick paper.

Moreover, even if Chittick (1969) did disclose a Schottky barrier, it would still not render Claim 11 anticipated. As the Court has already determined, Claim 11 is limited to PIN and PN junctions, or those junctions in the body of amorphous silicon, as opposed to those at the surface. Thus, the Court concludes the '521 patent was not anticipated by the Chittick (1969) paper.

### b. LeComber and Spear (1972)

In 1972, Spear and LeComber published an article entitled "Investigation of the Localized State Distribution in Amorphous Silicon Films." (DX-57). The article purported to summarize previous studies and to report on certain bulk properties of amorphous silicon created by glow discharge in silane. (Transcript, pp. 815, 1410).

Defendants argue that Spear and Lecomber (1972) disclosed a Schottky barrier junction consisting of an interface between deposited gold metal and glow discharge amorphous silicon. They argue that this gold metal-amorphous silicon device is a "semiconductor device" as that term is used in Claim 11.

Plaintiff, on the other hand, contends that the Court should rely on Dr. Lucovsky's testimony that the article, while reporting on electronic states and electronic transport in amorphous silicon films, made no disclosure of a semiconductor junction or any form of a Schottky barrier. (Transcript, p. 1410).

The Court finds that the Spear and LeComber (1972) does not teach the formation of a semiconductor device which has a semiconductor junction in a body of amorphous silicon as required by Claim 11. Spear and LeComber (1972) does not report results—like rectification or photovoltage—associated with semiconductor junc-

**24.** Defendants expert further speculated that an article written in 1972 by LeComber, Madam and Spear (DX-58) also used the Chittick materials. The testimony regarding this material was as follows:

Q. And the semiconductor material that they use that you just told us, did it have any relation to Chittick's material?
A. It is Chittick's material.
Q. How do you know that?
A. It uses an apparatus that is a carbon copy of the apparatus used by Chittick.
In fact—this is not in the paper, in this particular paper—but we know that Chittick's apparatus was transferred to the group that is supporting here, and we also know, in fact, that some of Chittick's samples were transferred and measured.
So there is no question that this material being examined is the material of Chittick. (Transcript, pp. 823–824). The Court cannot agree with Dr. Paul's conclusion. Dr. Paul himself testified that there is no disclosure in the article that the material is the same or even created from the "apparatus that is a carbon copy of the apparatus used by Chittick". This conjecture upon conjecture compels the Court to find that there is no convincing evidence that the materials in fact were the same as those used by Chittick in preparing his 1969 article.

tions. Thus, the Court concludes that Claim 11 was not anticipated by Spear and LeComber (1972).

The Court concludes that Defendants have not shown by clear and convincing evidence that Claim 11 of the '521 patent was anticipated by prior art.

### 2. Obviousness

Defendants contend that the '521 patent is invalid, under 35 U.S.C. § 103. Section 103 states:

> a patent may not be obtained ... if the differences between the subject matter sought to be patented and prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

35 U.S.C. § 103 (1988). The Court of Appeals for the Federal Circuit has set forth the criterion necessary for a determination of obviousness:

> whether the prior art would have suggested to one of ordinary skill in the art that this process should be carried out and would have a reasonable likelihood of success, viewed in the light of the prior art. Both the suggestion and the expectation of success must be founded in the prior art, not in the applicant's disclosure.

*In re Dow Chem. Co.*, 837 F.2d 469, 473 (Fed.Cir.1988) (citations omitted).

■■■■■ The Court's determination of obviousness requires resolution of three issues: (1) the scope and content of the prior art; (2) the differences between the prior art and the claims at issue; and (3) the level of ordinary skill in the pertinent prior art. *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966). The Court must also consider any secondary considerations such as the commercial success of the '521 patent, long felt but unsolved needs in the art, and the failure of others to solve the problem. *Id.* at 17–18, 86 S.Ct. at 694. As with all defenses of invalidity, Defendants have the burden of proving obviousness by clear and convincing evidence. *Custom Accessories,*

*Inc. v. Jeffrey–Allan Industries, Inc.*, 807 F.2d 955, 961 (Fed.Cir.1986).

Defendants argue that Claims 11–14 and Claim 18 were obvious to a person with ordinary skill in the art based on the state of the art prior to 1974, Chittick (1969), and *Anderson et al.*, "Optical and Electrical Properties of Boron–Implanted Amorphous Geranium Thin Films" 1974) (DX–62), in combination with either: (1) U.S. Patent No. 2,780,765 to *Chapin* (DX–72); (2) British Patent No. 1,017,119 to *Sterling* (DX–76); (3) U.S. Patent No. 3,433,677 to *Robinson* (DX–78); or (4) U.S. Patent No. 3,009,-981 to *Wildi et al* (DX–89). In addition, Defendants contend that Claims 11 and Claims 15–17 would have been obvious from Chittick (1969) and *Anderson et al.* in combination with either: (1) U.S. Patent No. 2,986,591 to *Swanson et al.* (DX–66); (2) U.S. Patent No. 3,378,414 to *Freck et al.* (DX–71); or (3) Melchior, "Sensitive High Speed Photodetectors for the Demodulation of Visible Near Infrared Light" (1973) (DX–67).

#### a. Level of Ordinary Skill in the Pertinent Art

■■■■■ The Court must consider the level of ordinary skill in the art at the time of the claimed invention. The Court must keep in mind the differences between the knowledge available fifteen to twenty years later to prove an argument, and the knowledge available during the time frame in question. *See Kloster Speedsteel AB v. Crucible Inc.*, 793 F.2d 1565, 1574 (Fed.Cir. 1986), *cert. denied*, 479 U.S. 1034, 107 S.Ct. 882, 93 L.Ed.2d 836 (1987); *Uniroyal, Inc. v. Rudkin–Wiley Corp.*, 837 F.2d 1044, 1050–51 (Fed.Cir.), *cert. denied*, 488 U.S. 825, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988). An analysis of the level of ordinary skill in the art should incorporate the types of problems in the art, the prior art solutions to the problems, the rapidity of innovations in the field, the sophistication of the technology, the education of the inventor, and the educational level of active workers in the field. *Accord Bausch & Lomb, Inc. v. Barnes–Hind/Hydrocurve, Inc.*, 796 F.2d 443, 449–50 (Fed.Cir.1986), *cert. denied,*

484 U.S. 823, 108 S.Ct. 85, 98 L.Ed.2d 47 (1987).

Plaintiffs argue that a person of ordinary skill in the pertinent art in the mid-1970's would have had at least a Bachelor's degree in the physical sciences or electrical engineering with experience in the development or manufacture of semiconductor devices. (Transcript, p. 89). According to Lucovsky, a person working in the art with a Master's degree or a Ph.D. might have less experience in semiconductor devices, whereas a person with only a Bachelor's degree would have more experience. (Transcript, p. 89).

Defendants contend that the Court should use the following definition, provided by their expert Paul, of a person with ordinary skill in the art, in the 1974–1975 period: "a person with a Ph.D. in the art with five to ten years experience in a research laboratory beyond his degree." (Transcript, p. 644–45). Dr. Paul also defined the art relevant to the patented subject matter as including knowledge in the following areas:

i. semiconductor physics and semiconductor devices;

ii. band structure of semiconductor materials;

iii. semiconductor optical absorption, photoconductivity and photoluminescence;

iv. doping of semiconductor materials; and,

v. knowledge of semiconductor devices including PN junctions, PIN junctions, Schottky barriers, heterojunctions and other types of semiconductor devices.

(Transcript, pp. 642–43).

The Court finds that the level of ordinary skill in the art includes education, training, and experience in the manufacture of semiconductor devices. The Court finds that the art could be learned through various combinations of education, training, and experience.

### b. Scope and Content of Prior Art

■■■ The scope and content of the prior art includes printed publications before the invention, as well as prior use or knowledge in the United States. 35 U.S.C. § 102. In addition, the Court should consider any United States patent application subsequently issued, but filed before the invention and any other inventions not abandoned, suppressed, or concealed before the invention. *See* 35 U.S.C. § 102(a), (e), and (g). Unlike anticipation, obviousness does not require that the prior art strictly identify the elements of the claimed invention, but rather focuses on the general teachings of the field. *Application of Foster*, 343 F.2d 980, 987–89 (C.C.P.A.1965), *cert. denied*, 383 U.S. 966, 86 S.Ct. 1270, 16 L.Ed.2d 307 (1966).

### (1) Chittick (1969)

Chittick (1969) reports on various bulk properties of amorphous silicon produced by glow discharge. (Transcript, p. 1353). Chittick used two types of test apparatus to study amorphous silicon's resistivity and photoconductivity; both consisted of aluminum electrodes deposited on the amorphous silicon.

Chittick (1969) also discloses efforts to n-dope amorphous silicon deposited by glow discharge. Phosphine was added to the silane gas during deposition in amounts varying from 40 parts per million (ppm) to 4%. Chittick noted that these levels of phosphine did not result in changes of resistivity that would be expected with the same doping levels in single crystal silicon. (Transcript, p. 1369–70). Dr. Lucovsky interpreted these results as being consistent with the "conventional wisdom" that amorphous silicon was insensitive to doping.

Defendants allege that Chittick (1969) taught that amorphous silicon could be n-doped and p-doped. (Transcript, pp. 777–82, 879). In arriving at this conclusion, Defendants relied on a chart found within the article. The chart demonstrated that the addition of phosphorous at levels greater than 200 ppm led to changes in the conductivity of amorphous silicon. Defendant's expert, Dr. Paul, stated, based on

this chart, that Chittick was the first to publish the conclusion that amorphous silicon could be n-doped.

The Court finds Dr. Paul's testimony unpersuasive. Dr. Paul himself acknowledged that the conventional belief in *1974*, long after publication of Chittick (1969), was that doping of amorphous materials was "unlikely to be successful."[25] The notion of "chemical valence satisfaction" was the prevailing view of scientists in the early–1970s. Because amorphous materials lack long range order, scientists generally considered amorphous materials insensitive to doping. The introduction of impurity atoms would result in a normal chemical valence rather than doping.

Furthermore, the doping efforts of Chittick resulted in relatively small changes in the conductivity of amorphous silicon films, whereas the same doping levels would produce significant changes in crystalline silicon. (Transcript, pp. 1369–75). Thus, the results of Chittick were consistent with the then-accepted notion of chemical valence satisfaction. In fact, Dr. Lucovsky testified that Chittick (1969) would teach one of ordinary skill in the art that amorphous silicon could *not* be n-doped. (Transcript, pp. 1369–75).

In the same time frame, Spear and LeComber in "Substitutional Doping of Amorphous Silicon", *Solid State Communications*, Vol. 17 (1975) stated:

So far, attempts to control the properties of amorphous tetrahedrally coordinated semiconductors in the same systematic way have not been successful. Several workers in the field have expressed the

opinion that amorphous semiconductors may well be insensitive to doping. (PX–7, p. 704). One of the citations showing unsuccessful attempts at doping was to Chittick (1969).

Lastly, Chittick himself in *Chittick et al.*, "Glow Discharge Deposition of Amorphous Silicon: The Early Years" (1985), credits Spear and LeComber with being the first to successfully dope amorphous silicon. There Chittick refers to "the successful n and p-type doping announced by Spear and LeComber in 1975." (PX–234, p. 1). Hence, it is clear that Chittick (1969) did not render n-doping of amorphous silicon obvious.

(2) U.S. Patent No. 2,780,765 to Chapin ("Chapin patent")

Defendants relied on the Chapin patent to illustrate the state of the art in PN junction semiconductor devices. The semiconductor device disclosed in Chapin is a photovoltaic cell, in which an n-doped crystalline silicon body is surrounded by a thin p-doped crystalline layer. (DX–72; Transcript, pp. 872–79). The device utilizes a PN junction. (Transcript, p. 874).[26]

(3) U.S. Patent No. 2,986,591 to Swanson et al. ("Swanson patent")

Defendants used the Swanson patent as an example of the state of the art in PIN junction semiconductor devices. The device disclosed in the Swanson patent is also a photovoltaic cell. The semiconductor material in the Swanson patent is crystalline silicon. (DX–66, col. 6, 1. 16). Defendants presented this patent to demonstrate that it was common in the art to utilize the undoped silicon layer, or the intrinsic layer between the p and n layers.[27]

**25.** Dr. Paul in a letter to Physics Today stated that in 1974 the conventional belief was that "doping was very unlikely, because every impurity atom would achieve its natural valence in amorphous silicon." (PX–247 at 15, Transcript, pp. 939–940). Thus, Paul's own "deduction theory" regarding Chittick's paper destroying the chemical valence satisfaction theory is rebutted by his own letter in *Physics Today* where he credits Spear and LeComber and Carlson and Wronski with "bucking the conventional belief." (Transcript, pp. 935–940).

**26.** Defendants also make cursory reference in its post-trial brief to three other PN junction

patents: 1964 British patent (DX–76); U.S. patent no. 3,433,677 (DX–78); and U.S. Patent No. 3,009,981 (DX–89). The Court will not discuss these prior art references as they do not disclose relevant prior art different from that disclosed in the Chapin patent.

**27.** The Defendant also makes cursory reference to U.S. Patent No. 3,378,414 (DX–71) and an article, Melchior, "Sensitive High Speed Photodetectors for the Demodulation of Visible Near Infrared Light" (1973) (DX–67). Neither of these prior art references disclose relevant prior art beyond that disclosed in the Swanson patent.

#### c. Differences Between the Prior Art and the Claims at Issue

As the prior art references just discussed demonstrate, at the time of Dr. Carlson's invention glow discharged amorphous silicon was not considered useable for photovoltaic devices. Amorphous silicon's lack of long range order led scientists to believe that it was impossible to generate electron-hole pairs in a spatially extended region of amorphous silicon, and impossible to move both the holes and electrons out of that region. (Transcript, pp. 106, 375–76). Further, it was believed that amorphous materials were insensitive to doping so internal barriers could not be achieved by altering the conductivity properties of amorphous silicon.

In contrast with the prior art, the claims of the '521 patent demonstrate the formation of a semiconductor device with glow discharge amorphous silicon. Dr. Carlson "bucked the conventional belief" that the introduction of impurity atoms to amorphous material would cause the impurity atom to achieve its natural valence. (DX–247, p. 15). The '521 patent teaches beyond observations of amorphous silicon by demonstrating its usefulness for solar energy.

In addition to the new teachings regarding successful doping of amorphous silicon, Dr. Lucovsky testified that Dr. Carlson's inventions implemented two features not previously used with work on amorphous silicon: (1) the use of potential barriers to completely deplete the region; and (2) the transportation of holes and electrons across the region. (Transcript, pp. 1375–76).

#### d. Secondary Considerations

■ The Court must also consider objective evidence relevant to a determination of obviousness including the commercial success of the patent in suit, the unexpectedness of the results of the patent, the adoption of the patent's idea by others, and licensing of the patent. *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538–1539 (Fed.Cir.1983).

The Court, therefore, will not discuss these ref-

In this case, the Court finds that Dr. Carlson's invention did create unexpected results. First, the invention taught that amorphous silicon could be used to make a useful photovoltaic device, whereas prior to that time no one had demonstrated that an electric field could be created to separate the holes and electrons by forming a barrier in amorphous silicon. (Transcript, pp. 78–79, 1375–1376).

Second, the Court finds that the patent was commercially successful. The Court finds that both ARCO Solar and Solarex have enjoyed substantial sales of commercial devices incorporating amorphous silicon solar cells. Specifically, the Court finds that in the world market for photovoltaics, market share of amorphous silicon increased from 3% in 1981 to 40% in 1988. (PX–241; Transcript, pp. 21–22).

Third, the Court finds that the evidence of licensing of the patents in suit, including the license between Solarex and RCA as well as Solarex's license agreements with four other companies, indicates the nonobviousness of the invention in the industry. (PX–204).

■ From an analysis of the above factual considerations, the Court concludes that Defendants have failed to show that the relevant claims of the '521 patent were obvious to a person having ordinary skill in the art. The analysis of the scope and content of the prior art and the differences between the patent and the prior art demonstrate that Dr. Carlson's invention was nonobvious. The unexpectedness and commercial success of the invention further support this finding.

### B. The '148 Patent

■ Defendant alleges that the '148 patent is invalid as being obvious from the '521 patent and U.S. Patent No. 4,226,-897 to *Coleman* ("Coleman patent") (DX–137).

Reduced to its basic terms, Defendant argues that the '148 patent requires the intentional compensation of boron into the I-layer. If the '148 patent does not teach

erences.

*intentional* compensation, so the Defendant argues, then the '148 patent is disclosed in the '521 patent. The obviousness, argues Defendant, comes from the fact that under the '521 patent the I-layer would be incidentally p-doped because deposition of the I-layer follows deposition of the p-layer, and the '521 patent does not specifically provide for clearing out the deposition chamber between layers.

In considering the merits of Defendant's arguments, the Court adopts the discussion of the level of ordinary skill in the pertinent art set out in the discussion of the '521 patent.

### 1. Prior Art—Coleman Patent

With regard to prior art, the Court finds it unnecessary to discuss the '521 patent as it has been thoroughly discussed earlier in this opinion with regard to infringement. Therefore, the Court will discuss Defendant's only other prior art reference, the Coleman patent.

The Coleman patent teaches a method of producing semiconductor films by coating a substrate using a glow discharge deposition in silane. It also teaches the compensation of an amorphous silicon layer by adding diborane to silane so as to dope the amorphous silicon to neutral or p-doped.[28]

### 2. Differences Between the Prior Art and the Claims at Issue

The '148 patent teaches (1) compensation of the I-layer to reduce the space charge density to substantially neutral, and (2) the specific concentrations of a p-type dopant which would accomplish this. The '148 patent is different from the '521 patent in two significant respects. First, although there may be some residual boron in the I-layer of a device made under the '521 patent, the '521 patent does not specifically teach a compensated I-layer with a space charge density under illumination of substantially neutral. Second, the '521 patent does not teach the specific concentrations of the p-type dopants.

Moreover, although the Coleman patent does teach that diborane may be used to compensate amorphous silicon to neutral, it does not disclose that the amount of p-type dopant to be added is that amount sufficient to reduce the space charge density under illumination to substantially neutral. Nor does the Coleman patent identify the purpose of adding diborane to silane. The '148 patent not only teaches the compensated I-layer, but also teaches the *desirability* of compensating the I-layer.

The Court finds that to one of ordinary skill in the art of semiconductor devices, the '148 patent would not be obvious in light of the '521 patent and the Coleman patent. Although both the '521 patent and the Coleman patent suggest the improvement of compensating the I-layer to substantially neutral, this is not sufficient, in and of itself, to find obviousness. *See Alco Standard Corp. v. Tennessee Valley Authority*, 808 F.2d 1490, 1498 (Fed.Cir.1986), *cert. dismissed*, 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987). The prior art must also suggest the desirability of the improvement or modification. *Id.* Neither the '521 patent nor the Coleman patent discloses the purpose or benefit to be achieved by adding a specific amount of boron to the I-layer.

Moreover, the application of the '148 patent that Solarex filed with the PTO expressly incorporated the '521 patent. Thus, the PTO considered the '521 patent, and nonetheless issued the '148 patent as an improvement over the '521 patent. The PTO's findings in combination with the differences in the '148 patent discussed above, and the substantial commercial success of Solarex's devices leads the Court to conclude that Defendants have not proven invalidity of the '148 patent by clear and convincing evidence, and therefore, the presumption of validity prevails.

## VI. INEQUITABLE CONDUCT

Defendants argue that Carlson committed inequitable conduct in prosecution of the '521 patent by withholding highly rele-

---

**28.** (DX–137). "[D]uring formation of the a–Si coating ... diborane ... is added to the silane flow ... to dope the a–Si layer to neutral or to p-type...." (DX–137 col. 4, 1. 66 to col. 5, 1. 2).

vant and invalidating prior art from the Patent Examiner. Defendants aver that Carlson knew of his obligation to inform the PTO of prior art, and knew that the RCA patent department was aware of a 1969 article by Chittick.

### A. Legal Standard

Rule 56(a) of Title 37, Chapter 1 of the Code of Federal Regulations provides that applicants and their attorneys must "disclose to the [PTO] information they are aware of which is material to the examination of the application."[29] 37 C.F.R. 1.56(a) (1989). Applicants for patents and attorneys representing applicants owe the U.S. PTO a duty of candor, good faith and honesty. *FMC Corp. v. Manitowoc Co., Inc.*, 835 F.2d 1411, 1415 n. 8 (Fed.Cir. 1987); *Hycor Corp. v. Schlueter Co.*, 740 F.2d 1529, 1538 (Fed.Cir.1984); *American Standard Inc. v. Pfizer Inc.*, 722 F.Supp. 86, 141 (D.Del.1989) (citing *Precision Inst. Mfg. Co. v. Automotive M.M. Co.*, 324 U.S. 806, 818, 65 S.Ct. 993, 999, 89 L.Ed. 1381 (1945)).

An applicant or the attorney has a duty to disclose all material information of which they were aware and, any knowledge or action taken by the attorney is considered chargeable to the applicant. *FMC Corp. v. Manitowoc Co.*, 835 F.2d at 1415 n. 8. This duty has been held to be equally applicable to foreign practitioners who represent claims in the U.S. PTO through local firms. *Gemveto Jewelry Co., Inc. v. Lambert Bros., Inc.*, 542 F.Supp. 933, 943 (S.D.N.Y.1982).

One who alleges inequitable conduct based on a failure to disclose material prior art must show by clear and convincing evidence:

(a) the existence of material prior art or information;

(b) knowledge chargeable to the applicant of the prior art or information and its materiality; and

(c) failure of the applicant to disclose the art or information resulting from an intent to mislead the U.S. PTO.

*FMC Corp. v. Manitowoc Co.*, 835 F.2d at 1415.

For the Court to conclude that inequitable conduct is present the Court must first find that certain thresholds of materiality and intent are present. *Under Sea Industries, Inc. v. Dacor Corp.*, 833 F.2d 1551, 1559 (Fed.Cir.1987). Only if threshold levels of materiality and intent are present must the Court, as a matter of law, determine whether inequitable conduct was present. *J.P. Stevens & Co., Inc. v. Lex Tex Ltd., Inc.*, 747 F.2d 1553, 1562 (1984), *cert. denied*, 474 U.S. 822, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985) (citations omitted).

#### 1. Materiality[30]

Information is considered material if "there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent." 37 C.F.R. § 1.56(a); *Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 992 (Fed.Cir.1988).

An applicant need not disclose all prior art. *J.P. Stevens & Co., Inc.*, 747 F.2d at 1559. The applicant need not disclose prior art which is no more pertinent or merely cumulative to that considered by the examiner. *Rolls–Royce Ltd. v. GTE Valeron Corp.*, 800 F.2d 1101, 1107 (Fed. Cir.1986). Further, if the uncited art is less material than those already disclosed, the applicant and attorney have no obligation to disclose the art in issue. *Halliburton Co. v. Schlumberger Technology Corp.*, 925 F.2d 1435, 1440 (Fed.Cir.1991). Likewise, the applicant is not required to disclose information to the PTO that teaches away from the claimed invention. *See Bausch & Lomb, Inc. v. Barnes–Hind/Hydrocurve, Inc.*, 796 F.2d 443, 448–449 (Fed. Cir.1986), *cert. denied*, 484 U.S. 823, 108 S.Ct. 85, 98 L.Ed.2d 47 (1987); *see also Air*

---

**29.** Although Rule 56 was not adopted until 1977, the basic tenets of that rule were in effect in 1973–1974. *Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 551–552 (Fed.Cir.1990).

**30.** By separate Order, the Court has resolved the issue of the admissibility of the testimony of Martin Edlow.

*Prods. & Chems., Inc. v. Chas. S. Tanner Co.,* 219 U.S.P.Q. 223, 243 (D.S.C.1983).

The Court must consider all aspects of the patent prosecution to make a determination of a reference's materiality. As discussed in *J.P. Stevens,* the starting point for determining the materiality of a reference is the PTO standard and actions taken at the PTO. *J.P. Stevens,* 747 F.2d at 1562. In *Stevens,* the Court instructed:

> [T]he result of a PTO proceeding that assesses patentability in light of information not originally disclosed is of strong probative value in determining whether the nondisclosed information would have been material.

*Id.* In this regard, the *Stevens* Court found the District Court erred by not considering the reissue proceeding that had taken place where the prior art originally not disclosed was placed squarely before the PTO. *Id.*

### 2. Intent to Mislead or Deceive

 The Court must also find an intent to mislead or deceive the Patent and Trademark Office to establish proof of inequitable conduct. *Hewlett–Packard Co. v. Bausch & Lomb Inc.,* 882 F.2d 1556, 1562 (Fed.Cir.1989), *cert. denied,* 493 U.S. 1076, 110 S.Ct. 1125, 107 L.Ed.2d 1031 (1990). Because direct evidence of an intent to deceive rarely exists, the Court may rely on circumstantial evidence leading to an inference of intent to mislead as the basis for a finding of inequitable conduct. *Id.*

A finding of gross negligence alone, however, is insufficient to infer inequitable conduct. *Id.* Instead, the Court must view the conduct in light of the totality of the circumstances, "including the nature and level of culpability of the conduct and the absence or presence of affirmative evidence of good faith." *Id.* (citing *Kingsdown Medical Consultants, Ltd. v. Hollister Inc.,* 863 F.2d 867, 876 (Fed.Cir.1988)); *see also Consolidated Aluminum Corp. v. Foseco Int'l Ltd.,* 910 F.2d 804, 809 (Fed. Cir.1990); *RCA Corp. v. Data General,* 887 F.2d 1056, 1065 (Fed.Cir.1989).

In *FMC Corp. v. Manitowoc Co., Inc.,* the Federal Circuit held that intent is a question of fact, and

> an applicant who knew or should have known of the art or information, and of its materiality, is not automatically precluded thereby from an effort to convince the fact finder that the failure to disclose was nonetheless not due to an intent to mislead the Patent and Trademark Office; i.e., that, in light of all the circumstances of the case, an inference of intent to mislead is not warranted.

*FMC Corp.,* 835 F.2d at 1416. Although subjective good faith may prevent the inference of intent, if an undisclosed reference was material and the applicant knew or should have known that the reference was material, a mere denial of bad faith is insufficient. *Id.*

 Once the Court finds that a material reference existed that was not disclosed to the PTO and an intent to mislead or deceive, the Court must balance the degree of materiality against the degree of culpability. In balancing, materiality and intent are inversely related. Thus, "the more material the omission, the less culpable the intent required, and vice versa." *Halliburton Co.,* 925 F.2d at 1439 (citing *N.V. Akzo v. E.I. Dupont de Nemours,* 810 F.2d 1148, 1153 (Fed.Cir.1987)).

### B. Materiality and Disclosure

 The Court concludes that a reasonable examiner would not find the disclosure of Chittick (1969) material in deciding the '521 patent application. Although Chittick (1969) discusses the properties of glow discharged positive amorphous silicons, it neither indicates any clear-cut effects nor does it suggest its usefulness. Further, later references to Chittick (1969) demonstrate that scientists in the field thought that Chittick (1969) taught away from successful doping of amorphous silicon.

Moreover, an amendment filed on April 15, 1977, during the prosecution of the '268 patent,[31] did cite Chittick (1969). (PX–7, p.

---

**31.** The '268 patent ultimately became '521 patent. *See* DX–46 (Patent Office File Wrapper of the '521 patent).

268; Transcript, p. 496). In the amendment, the RCA attorney stated that the "applicant contends that neither article teaches his invention." *Id.* Even though plaintiffs were not required to disclose Chittick (1969) (because it taught away from the invention), they did disclose it on April 15, 1977. This disclosure precludes a finding of an intent to mislead or deceive on the part of Solarex. Indeed, it demonstrates a good faith effort to comply with disclosure requirements.

The Court concludes that defendants have not shown by clear and convincing evidence that in prosecution of the '521 patent, plaintiffs failed to disclose material information to the PTO with the intent to deceive. Without the requisite showing of culpability and materiality, it is not necessary for the Court to engage in balancing the materiality of Chittick (1969) against Solarex's intent. The reference was not material and Solarex did not act in bad faith. Therefore, the Court concludes that there was no inequitable conduct in the prosecution of the three patents in suit.

## VII. CONCLUSION

The Court concludes that Plaintiff Solarex does have standing to maintain this action. In addition, the Court concludes that Plaintiff's patents '521, '844, and '148 are valid and enforceable patents. Finally, the Court concludes that Defendants infringed each of the patents, although not willfully.

The parties shall each submit a Proposed Form of Final Judgment Order no later than November 16, 1992.